[Crim. No. 2622.   First Dist., Div. Two.   Mar. 30, 1950.]

THE PEOPLE, Respondent, v. WILLIAM B. SULLIVAN, Appellant.

.Alfred J. Hennessy for Appellant.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

GOODELL, J.—Appellant was convicted of a violation of section 261, subdivision 3, of the Penal Code and sentenced to the penitentiary.   He appeals from the judgment and from the order denying a new trial.

Appellant in his brief sets out the five contentions,—(1) that evidence of another alleged offense was improperly admitted; (2) insufficiency of the evidence to support the judgment; (3) errors of law arising during the trial; (4) error in the instructions, and (5) that the acts complained of did not

constitute rape. None of the five points, excepting the first, is developed in appellant's brief, hence our discussion will be confined to that one point.

On the evening of Saturday, January 29, 1949, the complaining witness, B. R., a woman of 25, and a woman friend of hers, attended a public dance in Oakland. Defendant asked B. R. to dance with him and thus they met. They danced several times together and between some of the dances they went to the bar and had highballs. About 12:30 defendant offered to drive both girls to their homes in San Francisco and they got into his car, a Plymouth sedan with one door on each side. After taking the other girl home defendant asked B. R. to go to his apartment but she refused, saying that she must go home as her mother was ill. Defendant drove around for a while and then drove southerly through the Mission District assuring B. R. that the route would lead into her neighborhood, but instead of taking her home he drove out of the city and past Tanforan racetrack. When she insisted on going home he turned around and drove westerly toward Skyline Boulevard and told her that either she would go to his apartment or he would turn into Sharp's Park. She still refused, and he drove toward Sharp's Park and stopped his car beside the road. When he did so and indicated his intentions she reminded him that he had given her his card and cautioned him to desist. Thereupon, she testified, "he grabbed me by my hair and put his hand around my throat and I began screaming, I was scared, and then he began hitting me." He hit her with his fists on her head and face; she had bumps on her head and her face was scratched and cut, her nose was bleeding, and her mouth cut. He kept on beating her and finally she opened the door and slid out of the car onto the ground. Defendant was right behind and above her and still striking her on the face and head. She testified that she fought to the best of her ability, and to the point of exhaustion; that she "was sick, I could hardly fight, all I could do was pray . . ." Defendant, according to her testimony, forced her into the back seat of the car, forcibly took off two articles of her underwear and committed the offense charged. He drove back to San Francisco still insisting that she go to his apartment, and refusing to return her girdle until they got there. She pleaded with defendant to take her home but he drove up in front of his home and tried to drag her in. She grabbed hold of a post and finally he desisted and promised

to take her home, but after driving around he again insisted that they were going to his apartment. As he slowed down at the intersection of Market and Castro Streets, around 3:30 a. m., B. R. jumped from the car, and ran into a gas station where she sought the protection of the two attendants.

Both attendants testified that she was hysterical, and kept repeating "Don't let him hit me" and "Don't let him get me" and that she had blood on her face, the flesh was laid open under the side of her nose, her lips were swollen and there was a lump on the left side of her head. One of the attendants who washed the blood from her face testified that the flesh of her nose was torn, her lips puffed and her face lacerated; that the blood had dried and it took a little time to remove it around her mouth on her chin and cheek (Defendant testified B. R. received the face and head injuries when she jumped from the car at the gas station). On cross-examination the same attendant denied that the blood was only "a little splotch" and said it was smeared on her face in several places under her nose, on her cheek and chin. He estimated that the cut under her nose was about a half inch long and a quarter inch wide. Both men saw a girdle protruding from the right pocket of defendant's coat as he stood at the gas station.

A police inspector who saw B. R. on the morning in question, a few hours after the offense, testified that her lips were bruised and her cheek bone bruised and swollen. Two photographs in evidence, taken that morning, show the marks on B. R.'s face and a mark on her right hand.

The appellant's principal contention, and really his only point on appeal, arises from the admission in evidence, over objection, of the testimony of the witness R. W. respecting a similar attack upon herself about two months after the first offense and while appellant was out on bail on the first charge.

This witness, a girl of 18, testified that she met appellant for the first time at a public dance hall in San Francisco. A day or two later, on March 28, 1949, he called for her at her home about 8 o'clock p. m. and drove down Mission Street to a café, and from there to another café on the Bayshore Highway in San Mateo County where they danced a few times and he had some alcoholic drinks. She had nothing but soft drinks. They left there a little after 10 p. m. and drove up to McLaren Park which is in San Francisco. Defendant had some bottles of whiskey with him out of which, she said,

defendant tried to have her drink from the time they left her home until they returned there. At McLaren Park he stopped the car and told R. W. that she was going to be raped. She resisted and he forcibly removed an article of her underwear. She testified that every time she started to scream defendant hit her on the jaw with his fist. He told her to get over the back seat, and when she refused "he got over and drug me over and in the meantime practically choked me to death." "I was lying there, being pinned down. He pulled my hair; he hit me in the chin and jaw with his fist, about the head and face." She then testified respecting the act of intercourse. After that he drove her home, and on the way asked her for a date the next night but she told him she had an engagement. On the night after that he called on her at 8 o'clock. By prearrangement two officers were there and took defendant into custody, the witness having reported the rape the morning after its occurrence.

Before the testimony of R. W. had progressed to the point of describing the alleged offense the court interrupted, saying: "I think I will give an instruction . . . for the purpose of showing why this is admitted," and there was then read to the jury the following:

"Evidence was offered in this case for the purpose of showing that the defendant committed another crime other than the one of which he is accused and for which he is on trial in this action, namely, that he committed an act of rape with force and violence upon [R. W.].

"Such evidence was received for a limited purpose only: not to prove distinct offenses or continued criminality, but for such bearing, if any, as it might have on the question whether the defendant is innocent or guilty of the crime charged against him in this action, to wit: rape with force and violence upon the person of [B. R.].

"You are not permitted to consider that evidence for any other purpose, and as to that purpose you must weigh such evidence as you do all others in the case.

"The value, if any, of such evidence depends on whether or not it tends to show that there existed in the mind of the defendant a plan, scheme, system or design into which fitted the commission of the offense for which he is now on trial."

This instruction was given again at the end of the trial.

We are mindful of the rule that "The relevance of evidence that proves crimes other than that charged . . . must be

examined with care." (*People* v. *Peete*, 28 Cal.2d 306, 316 [169 P.2d 924], citing *People* v. *Albertson*, 23 Cal.2d 550, 577 [145 P.2d 7], and 46 Harv.L.Rev. 954, 983.) We are satisfied, however, that the testimony of the witness R. W. was properly admitted.

In *People* v. *Peete*, *supra*, page 317, the court said: "When a defendant's conduct in connection with the previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design. (See 2 Wigmore, Evidence (3d ed.) 202, 275; *R.* v. *Smith*, 41 Crim.App.Rep. 229, 236.)"

The court there cites and discusses numerous cases where the admission of such evidence was sanctioned. Since that decision there have been several cases where the same rule was held to have been properly applied, among them the following: *People* v. *Webster*, 79 Cal.App.2d 321 [179 P.2d 633] (murder); *People* v. *Cassandras*, 83 Cal.App.2d 272 [188 P.2d 546] (rape); *People* v. *Daniels*, 85 Cal.App.2d 182 [192 P.2d 788] (theft); *People* v. *Mason*, 86 Cal.App.2d 445 [195 P.2d 60] (theft); *People* v. *Brower*, 92 Cal.App.2d 562, 571 [207 P.2d 571] (forgery).

In the Cassandras case, pages 279-282, there will be found an extended exposition of the rule and at page 281 a discussion of its application in rape cases.

*People* v. *Webster*, *supra*, has many features similar to this case. In comparing the two cases it must be borne in mind that in the Webster case the prosecution had to rely wholly on circumstantial evidence, which is not the case here. Moreover, that was a prosecution (and conviction) for first degree murder. Notwithstanding the strictly circumstantial nature of the case and the gravity of the offense, evidence of a similar attack subsequent to the one on trial, was held admissible.

The evidence in the Webster case need not be repeated, it being sufficient to say that the crime was committed on June 30, 1946; that at the trial testimony was given by a woman to the effect that about six weeks later Webster had attacked her; the circumstances of his meeting with each woman, of what happened thereafter, and particularly the manner in which each had been attacked as evidenced in the first instance by marks on the victim's body, and in the second by the victim's testimony, were strikingly similar. On appeal the court at page 327 said: "It would be unusual to find two crimes with

greater details of similarity of execution, showing a common plan or scheme or system in the commission of both. Thus the evidence of the collateral crime was properly admitted. (*People* v. *Lisenba,* 14 Cal.2d 403 [94 P.2d 569] ; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924] ; *Lisenba* v. *People,* 314 U.S. 219 [62 S.Ct. 280, 86 L.Ed. 166].) That the collateral crime was committed after the commission of the offense for which defendant as on trial does not in itself furnish sufficient reason for rejection of the evidence concerning it. (*People* v. *Gosden,* 6 Cal.2d 14 [56 P.2d 211].) ''

In this case there is no question of identity in either instance, since defendant admits having B. R. in his car on January 30 and R. W. on March 28. He claims that with B. R. there was no intercourse at all. He admits that with R. W. there was, but claims it was with her consent and without resistance. In each instance defendant met the girl in a public dance hall. In each instance he took her in the same car and forced her into its back seat. In each instance he had one or more bottles of whiskey and tried repeatedly to get the girl to drink with him. In each instance when he met with resistance he hit the girl with his fists on the face and head, pulled her hair and put his hands on her throat. In each instance he took from the girl her undergarments. Appellant's counsel points out that he did not remove R. W.'s girdle while he did remove that of B. R.—this being the only variance pointed out by counsel in the procedure followed by appellant in the two cases. In each instance defendant drove to a spot in or near a park.

This was not a close case nor was it dependent on circumstantial evidence, as was the Albertson case. The testimony of the complaining witness respecting the beating which appellant had given her was corroborated to a large extent by the two gas station attendants who described fully her appearance when she arrived there in hysterics and seeking protection against appellant. It was corroborated also by the police inspector who saw her the same morning, and by the photographs.

Respondent's brief contains a full exposition of the People's contention that the testimony of R. W. was admissible as tending to show a pattern, scheme, design or plan common to both attacks amounting to a distinctive mode of operation. Although respondent therein cites the Albertson, Peete, Webster, Cassandras, Daniels and Mason cases, also *People* v. *Dabb,* 32 Cal.2d 491 [197 P.2d 1], and quotes from several of

them, appellant has made no attempt to distinguish any of them or to show by argument or citation that they have no application. He filed no closing brief, and when the appeal came on for argument his counsel did not appear.

The judgment and order denying a new trial are affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 27, 1950. Carter, J., and Schauer, J., voted for a hearing.