[Crim. No. 22823. Apr. 20, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID TASSELL, Defendant and Appellant.

**COUNSEL**

Philip D. McKibbin, under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, Lisa Short and George L. Schraer, Deputy State Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones, Roger E. Venturi and Anthony L. Dicce, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, J.**—After a jury trial, defendant David Tassell was convicted of kidnaping (Pen. Code, § 207), rape (Pen. Code, § 261, subds. (2), (3)), and forcible oral copulation (Pen. Code, § 288a). He appeals, contending that the trial court erred in two respects: (1) by admitting evidence of two earlier sex offenses; and (2) by using prior convictions twice to enhance the sentence. We affirm the convictions, but remand for resentencing.

### I

The convictions result from an incident with Anne B. on October 21, 1980. Miss B. testified that at the time she had been working as a waitress at a restaurant in Susanville for only a few days. As she left the restaurant at the end of her shift about 1:30 a.m., defendant left with her and asked if she would give him a ride home. She agreed because she had seen him at the restaurant on several occasions and thought he was a friend of others who worked there.

The two got into Miss B.'s Volkswagen camper van and drove off. When they reached defendant's destination, he attempted to kiss Miss B. She pushed him away and tried to open the driver's door to leave, but the door jammed. Defendant grabbed her neck with both hands and put his thumbs against her windpipe, making it difficult for her to breathe. While still holding her throat, he pushed Miss B. between the seats and threw her into the back of the van. She landed on her back, hitting her head and back on the floor. Defendant continued strangling her until she stopped resisting. He told her to "shut up" and promised that she would not be hurt if she did as told.

Defendant grabbed Miss B.'s hair and dragged her to the passenger seat. He himself sat in the driver's seat and ordered her to turn the ignition key

to start the engine and to shift gears. He then drove the van about a tenth of a mile.

After stopping the van, defendant ordered Miss B. to go to the back of the van, to take off her clothes, to fold out the bed and to lie down. She did so because defendant had hurt her before and she was frightened. Defendant took off his clothes, sat on Miss B.'s chest and ordered her to copulate him orally. She did so and defendant then told her to get dressed. After she had put on her slip and dress, he told her to lie down again. She obeyed and appellant had intercourse with her.

When he was finished, defendant had Miss B. drive him to a location about a mile away. He got out and told her he would kill her if she went to the police and that "it would never stick in court" because he would have an alibi. He had told her earlier that his name was Mike.

Miss B. drove to her apartment which she entered screaming. She told a houseguest that she had just been raped. She asked that he call Milt Bennett, her former boss. Bennett came over and stayed with Miss B. while she talked to the police. He also accompanied her to the hospital.

Bennett corroborated Miss B.'s testimony about her condition. When he arrived she was crying and gasping for air. Her waitress' uniform was torn and her hair messed up. Miss B. spent the rest of the night and the next day at his house with his family. When Bennett arrived home from work the next day, he noticed that Miss B.'s left eye and upper lip looked swollen. He also saw a bruise on her leg. She said that it was not the only bruise and that she was sore all over.

The police officers who responded to Miss B.'s call also testified about her emotional state. She was very upset, shaking, crying and had difficulty talking.

The doctor who had examined Miss B. that night testified that she was very upset. There was a rather large reddish area on her scalp with serous weeping, which was compatible with a severe hair pull. She had a four-inch long scrape on her left foreleg and some redness on her back.

Vaginal smears indicated that the person who had had intercourse with her was a nonsecretor; only 20 percent of the population are nonsecretors. Defendant is a nonsecretor.

Defendant testified that Miss B. had been a willing participant in the acts of oral copulation and sexual intercourse. He denied threatening or choking

her or pulling her hair. He admitted saying to the police, "I don't need this," when they came to his door at 8:30 a.m. on October 21, 1980, and told him that a "girl" had accused him of raping her. He also admitted telling the occupants of the apartment where he had been staying, "I've been here all night," but he explained that he thought the police were talking about a rape that had occurred an hour or so before. He had no idea how Miss B. could have received the scrapes and red marks the doctor had mentioned. He had not noticed a tear in Miss B.'s uniform at the restaurant or after leaving with her. He did not notice Miss B.'s mood when he left her, but she was not crying.

Evidence of two prior sex offenses was admitted to show "common design or plan" and to corroborate Miss B.'s testimony.[1]

As part of its case in chief the prosecution presented testimony by Mrs. G. regarding offenses defendant committed against her in 1976 and by Cherie B. regarding offenses committed against her in 1977.

Mrs. G. related that defendant attacked her as she was leaving work on her third day of employment as a barmaid in Vista, California. She had seen him in the bar on her first or second night of work. On the night of the attack defendant had a drink earlier in the evening, spoke to her briefly and left. He returned about midnight and chatted with her again. At closing time he followed her to her car, leaned over and kissed her as she started the engine. She tried unsuccessfully to push him away. He forced his way into her car, grabbed her neck and held her in a choke hold while he drove to a secluded spot. He stopped the car, grabbed her by the throat and forced her down on the seat. He told her to undress and to get in the back seat. After she complied, he attempted to force her to copulate him orally, but she gagged. He then turned her over on her stomach and had anal intercourse. He finished by turning her over again and having vaginal intercourse. He then let her get dressed and drove her back to the bar. He told her that she could tell her boyfriend and the police and that he would not deny the incident.

Cherie B. testified that defendant picked her up while she was hitchhiking one night in Redding in 1977. He pulled off the road on a purported errand and attempted to kiss her. He put his hand around her throat with his thumb on her windpipe. She fought, and he grabbed her hair and told her to stop fighting or he would break her neck. He continued pressing on her throat

---

[1]The effect, if any, of Proposition 8 on the question of the admissibility of evidence of other offenses is not considered here since the offenses in this case predate June 1982. (See *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].)

until she stopped fighting. He ordered her to remove her bra and to orally copulate him. He put his penis in her mouth for a minute and then attempted vaginal intercourse while still holding her throat. His attempt was, at first, unsuccessful, as was an attempt at anal intercourse. Eventually he succeeded in having vaginal intercourse. He told Cherie B. that his name was Mike and that it would do no good to report the crimes because his friends would give him an alibi. He let her get out of the car and walk away.

II

The first issue raised is the admissibility of the evidence of the crimes directed against Cherie B. and Mrs. G. Defendant contends that since, with respect to the charged crime, the evidence was not material to any issue of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," the only issue to which the evidence was relevant was his disposition—precisely what section 1101 of the Evidence Code forbids.[2]

■ While the People do not contend that the evidence of the crimes against Mrs. G. and Cherie B. was admissible to identify defendant as the perpetrator of the offenses against Miss B.—identity having been conceded[3]—it is claimed that the evidence was properly admitted to show "common design or plan" and to corroborate Miss B.'s testimony. Although the People's argument is supported by language in *People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433], we have concluded that the evidence is not admissible on the "common plan" theory.

We acknowledge that our pronouncements in the area of "other crimes" evidence have not been entirely consistent. Nevertheless, recent decisions—

---

[2]Evidence Code section 1101 reads as follows: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

According to the Law Revision Commission, section 1101 was intended as a codification of prior law. (Cal. Law Revision Com. com. to Evid. Code, § 1101, 29B West's Ann. Evid. Code (1966 ed.) p. 9.)

[3]During *in limine* discussions, defense counsel indicated that "as of right now" his client would testify and that the defense would be consent. If this prediction had proved inaccurate and an issue of identity had remained in the case after the defense rested, it surely would have constituted an abuse of discretion not to permit the People to reopen for the purpose of offering additional relevant evidence on the issue of identity. (Cf. *People* v. *Chacon* (1968) 69 Cal.2d 765, 777, fn. 5 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].)

notably *People* v. *Thompson* (1980) 27 Cal.3d 303, 314-321 [165 Cal.Rptr. 289, 611 P.2d 883]—have done much to isolate and identify the various considerations which play a part in determining the admissibility of such evidence. *Thompson,* in particular, explains that the question of weighing probative value against prejudicial effect does not even arise, unless the disputed evidence is relevant to an ultimate fact " 'actually in dispute.' " (*Id.* at pp. 315-318.) Since much of the confusion concerning this class of evidence—particularly with respect to the subclass of "other sex crimes"—is due to successive failures to relate the suggested relevance of the proffered evidence to issues "actually in dispute," an analysis of relatively recent key decisions may be of assistance.

A good place to start is *People* v. *Covert* (1967) 249 Cal.App.2d 81 [57 Cal.Rptr. 220]. The case is valuable for our purposes because it (1) contains an excellent summary of the conflicting decisions which then plagued the courts; (2) identifies the many meanings of the "common scheme or plan" concept which, as noted, was the basis on which the evidence was admitted here; and (3) triggered the so-called "corroboration" rationale which was later perpetuated in *People* v. *Kazee* (1975) 47 Cal.App.3d 593 [121 Cal.Rptr. 221], but laid to rest in *People* v. *Thomas, supra.*

*Covert* points out that " '[c]ommon scheme or plan' and similar phrases supply a frequent ticket of admissibility. Unfortunately the ticket has often permitted admittance without heed to the actual issues presented to the prosecution by the elements of the crime or by the claims of the defense." (*Id.* at p. 86.) *Covert* further demonstrates that many decisions recognize that common scheme or plan is nothing but a "subordinate objective of proof, whose relevance depends on some other actual issue, such as mistaken identity or innocent intent." (*Id.* at p. 84.) Thus, "common scheme" is such an objective where it is claimed that there is, in truth, a "single conception or plot" of which the charged and uncharged crimes are individual manifestations. (*Id.* at pp. 86-87.) Absent such a "grand design," talk of "common plan or scheme" is really nothing but the bestowing of a respectable label on a disreputable basis for admissibility—the defendant's disposition.[4]

---

[4]*Covert* actually identified four senses in which the "common scheme or plan" concept is used. First, the speaker may be referring to a conspiracy, conception or plot to commit the charged offense as well as the uncharged one. Typical would be a case like *People* v. *Glass* (1910) 158 Cal. 650 [112 P. 281] where, on a charge of bribing one supervisor, evidence of payment of money to other supervisors was held admissible to show that the specific act of bribery charged was "part performance" of a conspiracy to bribe a majority. Second, "common scheme" is often used synonymously with modus operandi—a characteristic, distinctive method of committing a crime. Third, in sex cases prior offenses against the same victim are often spoken of as evincing a "common" lewd disposition toward that person. Finally, according to *Covert*: "A fourth incarnation of the common plan notion appears in *People* v. *Peete, supra,* 28 Cal.2d at pages 316-319 [169 P.2d 924], involving the defend-

On the other hand, *Covert* also recognized that quite a few cases have embraced "the position that 'common plan or scheme' is itself a fact in issue, tending to prove commission of the sex crime charged without apparent regard for the specific issues raised in the trial." (*Id.* at pp. 85-86.) *Covert* then sets out to harmonize the cases as best it can.

The particular decision which triggered *Covert's* soul-searching was *People* v. *Ing* (1967) 65 Cal.2d 603 [55 Cal.Rptr. 902, 442 P.2d 590]. Ing, a doctor, had been charged with 1964 sex crimes against a female patient. Evidence of four other, quite similar crimes, committed as long ago as 1949, was admitted. We approved, holding that because of the "striking similarities between the other offenses and the ones charged the evidence was relevant on the question of common scheme or plan . . . ." (*Id.* at p. 612.) In *Ing* there was no issue of identity, nor could it be rationally contended that the crimes which started in 1949 formed part of a single "conception or plot." Thus, it is clear that *Ing* fell into that class of cases in which "common scheme or plan" became a euphemism for "disposition." The fact that the striking similarity of the uncharged crimes helped to identify Ing as the perpetrator of the charged crime was immaterial, since identity was not disputed. Proof that Ing had committed the prior crimes did, of course, advance the People's case considerably: first, if believed, it established Ing's disposition to commit that type of offense; second, by independently relating strikingly similar stories of relatively unusual sex crimes, the various victims corroborated each other.

In any event, faced with a Supreme Court decision which did not seem to fit the article of faith that evidence of other crimes is inadmissible on the merits where it proves nothing relevant but the defendant's disposition, the *Covert* court came up with a new rule, applicable only to sex crimes: that evidence of other crimes by the defendant is admissible to corroborate the victim. (*Id.* at p. 88.) This theory lay dormant for seven years. No case expressly followed it, none disavowed it.

After *Covert* the action shifted back to this court. *People* v. *Cramer* (1967) 67 Cal.2d 126 [60 Cal.Rptr. 230, 429 P.2d 582] was a prosecution for a violation of section 288 of the Penal Code, the victim being a 13-year-old boy. There was no question of identity, nor was there anything characteristic about the defendant's method of "seducing" the boy. Yet we

---

ant's separate but similar schemes to acquire property by murder. In that case common plan did not form an independent ground of admissibility, but was relevant to show the defendant's motive. Nevertheless, the *Peete* case has been cited as authority for evidence of uncharged sex offenses as proof of design, seemingly without regard to motive or other specific issues posed in the trial (e.g., *People* v. *Sylvia, supra,* 54 Cal.2d at p. 119 [4 Cal.Rptr. 509, 351 P.2d 781]; *People* v. *Sullivan, supra,* 96 Cal.App.2d at p. 746 [216 P.2d 558])." (249 Cal.App.2d at p. 87.)

upheld the admissibility of a similar episode with another boy, testified to by the other victim. While we mentioned "common design, or *modus operandi*," these concepts could not have formed the true rationale of the decision: there was no overall plot to molest boys and the modus operandi, though similar, was routine. In any event, as noted, there was no issue of identity, so similarity in modus operandi was irrelevant.

Soon after *Cramer* we faced a very similar case in *People* v. *Stanley* (1967) 67 Cal.2d 812 [63 Cal.Rptr. 825, 433 P.2d 913]. The only real distinction between *Stanley* and *Cramer* was that in *Stanley* the evidence concerning the noncharged crime came from the victim of the charged offense. This time, however, we reversed, holding that "where the basic issue of the case is the veracity of the prosecuting witness and the defendant as to the commission of the acts charged, the trier of fact is not aided by evidence of other offenses where that evidence is limited to the uncorroborated testimony of the prosecuting witness." (*Id.* at p. 817.)

Although neither *Cramer* nor *Stanley* adverted to *Covert's* corroboration theory, extrapolation from the two holdings seemed to give it support: in neither case did the evidence of other offenses prove any disputed issue except the defendant's disposition which was, as such, taboo. Yet where the other offense was testified to by one other than the victim of the charged crime, the evidence was admitted; where that victim merely corroborated himself, it was excluded.

After *Stanley* the focus of our cases shifted from sex crimes to more conventional crimes of violence—robbery and homicide. We first encounter *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91], a watershed decision. Since in *Haston* there was a true issue of identity, we reiterated that evidence of a genuinely distinctive modus operandi—the criminal's calling card, as it were—was admissible to prove that contested issue. In so holding we overruled many cases which had given lip service to the rule, but in truth had found uniqueness in textbook methods of execution. (*Id.*, at p. 250, fn. 22.)

Less than a year after *Haston,* we decided *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700] which complements it. In *Sam*— unlike *Haston*—there was no issue of identity and we held that evidence of a similar modus operandi with respect to other crimes was, therefore, inadmissible. (See also *People* v. *Guerrero* (1976) 16 Cal.3d 719, 725 [129 Cal.Rptr. 166, 548 P.2d 366].)

Finally, in *People* v. *Thornton* (1974) 11 Cal.3d 738, 755-756 [114 Cal.Rptr. 467, 523 P.2d 267], we bridged the gap between ordinary crimes

of violence and violent sex crimes, by applying the rule of *Haston* to the latter.

While *People* v. *Sam, supra,* involved an emphatic reaffirmation of the rule that evidence of other crimes must be material on some contested issue, cases such as *People* v. *Ing, supra,* and *People* v. *Cramer, supra*—decisions which had ignored the rule—were not expressly overruled. Were sex crimes, perhaps, governed by some other standard of admissibility? Was *Covert's* explanation of *Ing* correct, after all? One Court of Appeal thought so and, in *People* v. *Kazee* (1975) 47 Cal.App.3d 593 [121 Cal.Rptr. 221] reverted to the *Covert* rationale of corroboration as explaining the apparent continued validity of *Cramer* and *Ing.*

*Kazee's* reception was frosty. Although the majority in *People* v. *Creighton* (1976) 57 Cal.App.3d 314, 326 [129 Cal.Rptr. 249], followed it with obvious reluctance, Justice Jefferson's dissent was uninhibited and robust: "... untenable and indefensible ...." (*Id.* at p. 329.) Surely, the time had come for a review of the problem by this court—a resolution of the conflict between *Cramer-Ing* and the *Haston-Sam-Thornton* trilogy. Unfortunately, the case which might have served as the vehicle for such a resolution—*People* v. *Thomas, supra*—failed to do the job because its briefing went off on a tangent.

No useful purpose would be served in reconstructing the exact battle lines as drawn in *Thomas.* Suffice it to say that while the defendant attacked *Kazee's* and *Covert's* corroboration theory, he accepted *Cramer* instead of arguing that, in the absence of an identity issue, *Cramer* could not have survived *Haston, Sam* and *Thornton.* We, in turn, did not address an argument not advanced. Instead, we referred to a dictum from *People* v. *Kelley* (1967) 66 Cal.2d 232, 243 [57 Cal.Rptr. 363, 424 P.2d 947], to the effect that where other sex offenses "are not too remote and are similar to the offense charged and are committed with persons similar to the prosecuting witness ... [they] are admissible as showing a common scheme or plan." We did not, however, decide the case on the basis of this dictum, since we found the earlier offenses to have been too remote.[5] As for the *Covert-Kazee* corroboration theory, we gave it short shrift, recognizing only that if evidence of other crimes finds its way into the record by some legitimate avenue of admissibility, it will often tend to corroborate the victim of the charged crime. (*Id.* at pp. 468-469.)

---

[5]The *Kelley* dictum did not explain the 15-year gap of *Ing.*

Since *Thomas* we have had an opportunity to survey the entire area of "other crimes" evidence.[6] In *People* v. *Thompson, supra,* 27 Cal.3d at pages 314-321, we restated certain basic principles pertinent to the admissibility of evidence of other crimes—particularly the dogma which posits as a *sine qua non* the existence of a contested issue to which those crimes are relevant. In addition, we stressed the importance of assessing what, in other contexts, would be called the "cost-effectiveness" of the evidence. As summarized by one learned commentator: "The significance of the *Thompson* case lies in its holding that, when evidence is offered that a defendant committed an offense other than that for which he is on trial, its *relevancy* to prove some *disputed* fact on a theory in addition to its relevancy as character-trait or propensity evidence—such as intent, motive, or modus operandi—*must* be *substantial* on the theory tendered in order for the probative value of such evidence to be considered as outweighing the manifest danger of undue prejudice, to avoid exclusion under Evid. Code section 352, even though not barred by Evid. Code section 1110(b)." (Jefferson, Cal. Evidence Bench Book (2d ed.) § 33.6, p. 1211.)

While defendant in this case still does not attack *Cramer* head-on—probably a sensible tactic from an advocate's point of view—he does cite *Haston* and *Sam* and argues most forcefully that even if the evidence of other sex offenses was admissible in spite of section 1101 of the Evidence Code, *Thompson* compelled its exclusion under section 352.

We do not, however, even reach the question whether the evidence should have been suppressed under Evidence Code section 352. As noted at the outset, this case presented no issue of identity.[7] No rational argument would

---

[6]We have never had occasion to follow *People* v. *Thomas, supra. People* v. *Pendleton* (1979) 25 Cal.3d 371, 376-378 [158 Cal.Rptr. 343, 599 P.2d 649], which seemed to do so, actually involved an issue of intent at the time of the defendant's nighttime entry into a woman's bedroom. As such it was well within the mainstream of decisions to the effect that evidence of other crimes is admissible to solve an issue of equivocal intent. (E.g., *People* v. *Westek* (1948) 31 Cal.2d 469, 480-481 [190 P.2d 9] [defendant claimed that touching of young boys was not lustful but done with innocent intent]; *People* v. *Honaker* (1962) 205 Cal.App.2d 243, 244-245 [22 Cal.Rptr. 829] [defendant claims that touching of girl's private parts was accidental]; cf. *People* v. *Tawney* (1959) 168 Cal.App.2d 599, 615-616 [336 P.2d 659] [defendant claims that he was entrapped into scheme of selling fraudulent decrees].)

[7]Nor, to keep the record straight, was there any ambiguity about defendant's intent. In *People* v. *Kelley, supra,* we recognized that evidence of other sex offenses "is admissible in cases where the proof of defendant's intent is ambiguous, as when he admits the acts and denies the necessary intent because of mistake or accident. (*Id.* at pp. 242-243.)" Several cases of this nature are noted in footnote 6, *ante.* Here, however, there is nothing equivocal or ambiguous about defendant's intent. Whichever version of the facts is believed, defendant intended intercourse. On his evidence, Miss B. unmistakably consented. On hers, he accomplished the intended act against her will by use of force and threats. Right or wrong, the theory of Justice Reynoso's dissent—that the uncharged offenses were admissible to negative a mistaken but reasonable belief that Miss B. had consented—is inapplicable to this case, since no such defense was ever suggested.

support a contention that the three sets of sex crimes were part of one larger plan. There being no issue of identity, it is immaterial whether the modus operandi of the charged crime was similar to that of the uncharged offenses. While the People rely on the "common plan or scheme" rationale for admissibility, under the circumstances that is merely a euphemism for "disposition." The evidence was not admissible.[8]

■ Although we conclude that the evidence was erroneously admitted, the error does not require reversal. The evidence was obviously quite probative, but it does not appear reasonably probable that the jury would have reached a more favorable result without it. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) This was not an evenly balanced case of credibility. There was compelling corroboration of the victim's testimony, but none of defendant's story. Miss B.'s version of events was supported by testimony of the investigating officers, her former boss, and the doctor about her highly emotional state, her torn uniform, her bruises, abrasions and red scalp. In light of this evidence, plus defendant's own statements at the time of his arrest, his story of consensual sex was unconvincing and implausible. In particular, he made no attempt at explaining away the physical evidence of assaultive conduct. In sum, we find no reasonable probability of a more favorable result had the jury not heard the evidence of defendant's other offenses.

## III

The trial court sentenced defendant to state prison for a total unstayed term of 28 years. He was given the upper term of seven years for kidnaping (count I), but execution of that sentence was stayed pursuant to Penal Code section 654.[9] He was sentenced to the upper term of eight years for rape (count II) and—pursuant to the special sentencing provisions of section 667.6, subdivision (c) for forcible sex offenses—to a fully consecutive upper term of eight years for oral copulation (count III). Enhancements for prior convictions were added to the terms of both counts II and III—one year to each for a prior Florida statutory rape conviction (§ 667.5, subd. (b)) and five years to each for a prior California rape conviction (§ 667.6, subd. (a)).

The trial court justified its double use of the same prior convictions for enhancement by relying on section 1170.1, subdivision (i) (formerly subd.

---

[8]Insofar as *People* v. *Ing, supra, People* v. *Cramer, supra,* and *People* v. *Thomas, supra,* ignore the principle that evidence of other crimes must relate to an issue actually in dispute, they were impliedly disapproved by *People* v. *Thompson, supra.* It is, unfortunately, impossible to list all other cases inconsistent with *Thompson*—or, for that matter, *People* v. *Sam, supra,* on which, inter alia, *Thompson* relies. (*People* v. *Thompson, supra,* 27 Cal.3d at p. 317.) While it is relatively easy to collect decisions which announce an incorrect rule, it is almost impossible to find those which fail to state the correct one.

[9]Unless otherwise noted, hereafter all statutory references are to the Penal Code.

(h)).[10] Subdivision (i), which applies only to forcible sex offenses, provides: "For any violation of subdivision (2) or (3) of Section 261, Section 264.1, subdivision (b) of Section 288, Section 289, or sodomy or oral copulation by force, violence, duress, menace or threat of great bodily harm as provided in Section 286 or 288a, *the number of enhancements which may be imposed shall not be limited,* regardless of whether such enhancements are pursuant to this or some other section of law. *Each of such enhancements shall be a full and separately served enhancement* and shall not be merged with any term or with any other enhancement." (Italics added.)

■ Appellant contends the trial court read subdivision (i) of section 1170.1 too broadly in finding that it ordained using the same prior convictions twice to enhance one aggregate sentence. We agree. The obvious purpose of subdivision (i) is to nullify certain limitations set forth in other parts of section 1170.1 regarding the number and length of enhancements that may be added to particular counts. It is not intended to affect the method by which enhancements for prior convictions are imposed.

■ Section 1170.1 refers to two kinds of enhancements: (1) those which go to the nature of the offender; and (2) those which go to the nature of the offense. Enhancements for prior convictions—authorized by sections 667.5, 667.6 and 12022.1—are of the first sort. The second kind of enhancements—those which arise from the circumstances of the crime—are typified by sections 12022.5 and 12022.7: was a firearm used or was great bodily injury inflicted? Enhancements of the second kind enhance the several counts; those of the first kind, by contrast, have nothing to do with particular counts but, since they are related to the offender, are added only once as a step in arriving at the aggregate sentence.

■ Section 1170.1, subdivision (a) starts out by stating the basic rule that when a person is convicted of two or more felonies, the total sentence consists of (1) the principal term, (2) the subordinate term, and (3) any enhancements for prior convictions. In so doing, it makes it very clear that enhancements for prior convictions do not attach to particular counts but instead are added just once as the final step in computing the total sentence.[11]

---

[10]Until 1982 amendments to section 1170.1, subdivision (i) had been labelled subdivision (h).

[11]Section 1170.1, subdivision (a) provides in part: "Except as provided in subdivision (c) and subject to Section 654, when any person is convicted of two or more felonies, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same or by a different court, and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all such convictions shall be the sum of the principal term, the subordinate term and *any additional term imposed pursuant to Section 667.5, 667.6 or 12022.1. . . .*" (Italics added.)

Section 1170.1 has, however, certain provisions which soften the effect of enhancements that are attached to individual counts. It is these provisions that subdivision (i) is intended to nullify. One such softening provision is the limitation on the enhancements that may be included in the calculation of the subordinate term. Subdivision (a) provides that no enhancements are to be imposed for offenses which are not violent felonies; for violent felonies, the subordinate term may include only "one-third of any enhancements imposed pursuant to Section 12022, 12022.5 or 12022.7." Another limitation on count-appended enhancements is set forth in subdivision (e), which provides: "When two or more enhancements under Sections 12022, 12022.5, and 12022.7 may be imposed for any single offense, only the greatest enhancement shall apply; however, in cases of robbery, rape or burglary, or attempted robbery, rape or burglary the court may impose both (1) one enhancement for weapons as provided in either Section 12022, or 12022.5 and (2) an enhancement for great bodily injury as provided in Section 12022.7."

Subdivision (i) was added to section 1170.1 in 1979 as part of the same legislation that enacted section 667.6 in an extensive revision of laws on sex crimes. (See *Selected 1979 California Legislation,* 11 Pacific L.J. 429.) Subdivisions (a) and (b) of section 667.6 provide lengthy enhancements for prior convictions of forcible sex offenses when a person is again convicted of such an offense. As we noted in *People* v. *Belmontes* (1983) 34 Cal.3d 335 [193 Cal.Rptr. 882, 667 P.2d 686], subdivision (c) of section 667.6 provides, as an alternative to consecutive sentencing under section 1170.1, a much harsher sentencing scheme for persons convicted of forcible sex offenses. This harsher provision allows the court in its discretion to sentence a defendant to full term consecutive sentences rather than the "one-third of the middle term" consecutive sentence formula set forth in section 1170.1, subdivision (a).

Before section 667.6 was enacted, enhancements for prior conviction of forcible sex offenses were governed by the general provisions of section 667.5. While the Legislature enacted section 667.6, subdivisions (a) and (b) to increase the length of enhancements for prior convictions of recidivist sex offenders, there is no indication that it intended that such enhancements be otherwise treated differently than those in section 667.5. Indeed, the Legislature merely added a reference to section 667.6 next to the reference to section 667.5 in subdivision (a) of section 1170.1, which contains the instructions for computing consecutive sentences and makes it clear that enhancements for prior convictions (§§ 667.5, 667.6, 12022.1) are to be added just once as a component of the aggregate term. (Accord, *People* v. *Carter* (1983) 144 Cal.App.3d 534, 544-545 [193 Cal.Rptr. 193].)

Accordingly, we conclude that the trial court erred in using defendant's prior convictions twice to enhance his sentence.

## IV

Defendant has filed a supplemental brief raising an additional issue for the first time. That issue is whether the trial court erred in denying his motion to strike the prior Florida conviction on *Boykin-Tahl* grounds. We need not and do not consider this point since it was not raised until after we had granted the petition for hearing. (See 6 Witkin, Cal. Procedure (2d ed.) Appeal, § 613, pp. 4537-4538; *Flores* v. *Stone* (1913) 21 Cal.App. 105, 111 [131 P. 348].) Even if we were to consider the issue, the documentation submitted by defendant is insufficient to support his claim that he was not advised of his rights against self-incrimination and to confront and cross-examine witnesses at the time he entered his guilty plea. The documentation relates only to judgment and sentencing, and there is nothing relating to the time of entry of defendant's plea. Moreover, his allegations are insufficient for a collateral attack on his conviction, because he does not allege that he was unaware of his rights and would not have pleaded guilty had he known of them. (See *In re Ronald E.* (1977) 19 Cal.3d 315, 325, fn. 8 [137 Cal.Rptr. 781, 562 P.2d 684].)

The judgment of conviction is affirmed, but the matter is remanded for resentencing.

Bird, C. J., Mosk, J., Broussard, J., and Grodin, J., concurred.

**REYNOSO, J.**—I concur with the majority that the conviction should be affirmed and the matter remanded for resentencing. But, I respectfully dissent from the majority's conclusion that the evidence of past crimes, in the context of the case at bench, is not admissible.

A "common scheme or plan," I fully agree, is nothing but a "subordinate objective of proof, whose relevance depends on some other actual issue, such as mistaken identity or innocent intent." (*People* v. *Covert* (1967) 249 Cal.App.2d 81, 84 [57 Cal.Rptr. 220].) Since there is no issue of identity, "it is immaterial whether the modus operandi of the charged crime was similar to that of the uncharged offenses." (Maj. opn., *ante,* at p. 89.) The "common plan or scheme," it appears, is a euphemism for "disposition."

I part company with the majority on the issue of intent. The majority explains that "there is nothing equivocal or ambiguous about defendant's intent. Whichever version of the facts is believed defendant intended intercourse." Though factually correct, the intent to have intercourse is not the

sole requisite intent for the charged crime. It is, in addition, the intent to accomplish intercourse by means of force or threat.

Penal Code section 261 provides, "Rape is an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances: . . . (2) Where she resists, but her resistance is overcome by force or violence; [or] (3) Where she is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution. . . ." Of course, there is no rape if a female of sufficient capacity consents to sexual intercourse. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 154 [125 Cal.Rptr. 745, 542 P.2d 1337]; 1 Witkin, Cal. Crimes (1963) § 173, p. 165, § 288, pp. 265-266.) Penal Code section 26 adds that one is incapable of committing a crime if "[the] [p]ersons who committed the act [did so] . . . under an ignorance or mistake of fact, which disproved any criminal intent."

Rape is not a crime of specific intent; it requires nothing more than general criminal intent. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 766 [114 Cal.Rptr. 467, 523 P.2d 267].) Penal Code section 20 provides, "In every crime . . . there must exist a union, or joint operation of act and intent, or criminal negligence." Thus, "intent" as defined by section 20 means "wrongful intent." (*People* v. *Mayberry, supra,* at p. 154; see, *People* v. *Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850].) "So basic is this requirement [of a union of act and wrongful intent] that it is an invariable element of every crime unless excluded expressly or by necessary implication." (*People* v. *Vogel, supra,* at p. 801.) The necessary "wrongful intent," though, is merely the intention to do the interdicted act. (*People* v. *Dillon* (1926) 199 Cal. 1 [248 P. 230]; *People* v. *Wade* (1945) 71 Cal.App.2d 646 [163 P.2d 59].) But the act for which an intent is needed under Penal Code section 261 is not only the act of intercourse; it is, in addition, the acts of overcoming resistance by "force or violence" or "threats of great and immediate bodily harm."

Defendant's assertion that he reasonably believed that the prosecutrix consented amounts to a denial that he intended to use force or threats. As the Court of Appeal said in *People* v. *Jackson* (1980) 110 Cal.App.3d 560, 566 [167 Cal.Rptr. 915], the "[d]efendant's trial theory, that the victim had consented to the sexual acts, was tantamount to a denial that he had intended to achieve oral copulation and sexual intercourse by force or intimidation."

Penal Code section 261, subdivisions (2) and (3) (rape by means of force or threat) and section 207 (kidnaping) "neither expressly nor by necessary implication negate the continuing requirement that there be a union of act and wrongful intent. The severe penalties imposed for these offenses . . .

and the serious loss of reputation following conviction make it extremely unlikely that the Legislature intended to exclude as to those offenses the element of wrongful intent. *If a defendant entertains a reasonable and bona fide belief that a prosecutrix voluntarily consented to accompany him and to engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite under Penal Code section 20 to a conviction of either kidnaping . . . or rape by means of force or threat."* (*People* v. *Mayberry, supra,* at p. 155.) (Italics added.)

In short, though rape is a crime in which lack of consent is an essential element (see Witkin, Cal. Crimes (1963) § 172, p. 164), even absent actual consent, a reasonable belief of consent will negate intent. (See generally, *Mayberry, supra,* at p. 156.) In *Mayberry* defendants claimed that the trial court erred in refusing to give instructions directing the jury to acquit defendants of rape and kidnaping "if the jury had a reasonable doubt as to whether . . . [defendant] reasonably and genuinely believed that . . . [the prosecutrix] freely consented to her movement . . . [with him] and to sexual intercourse with him." (*Mayberry,* at p. 153.) This court, by unanimous decision, concluded that if the defendant "raised a reasonable doubt as to whether he had a [bona fide and reasonable belief that the prosecutrix consented to the sexual intercourse]" (*People* v. *Mayberry, supra,* at p. 157) then there is an issue as to intent.[1]

In *People* v. *Hampton* (1981) 118 Cal.App.3d 324, 329 [173 Cal.Rptr. 268], elaborating on *Mayberry,* the Court of Appeal concluded that *Mayberry* compelled the conclusion that a reasonable doubt could be raised by the mere testimony of the defendant that the prosecutrix consented. Since defendant asserts just that consent, his intent is at issue.

I turn to the question of whether "the prior offense was sufficiently similar in its commission to the charged offense to indicate that the defendant probably harbored the same intent in both instances." (*People* v. *Jackson* (1980) 110 Cal.App.3d 560, 566 [167 Cal.Rptr. 915].) The Court of Appeal—when this case was before that court—aptly expressed my view that: "the uncharged offenses in this instance do not bear even minor discrepancies with the charged offenses. The rape and oral copulation of a young woman in 1976 were perpetrated in a remarkably unique manner, singularly similar to the 1980 attack. The similarity is sufficient to be described as a mirror

---

[1]We recognize that a reasonable belief may negate intent in other circumstances as well. (See *People* v. *Hernandez* (1964) 61 Cal.2d 529 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092] [defendant in statutory rape case had reasonable belief that prosecutrix was 18 years or more in age]; *People* v. *Vogel, supra,* ["a [reasonable and] good faith belief that a former wife had obtained a divorce was a valid defense to a charge of bigamy arising out of a second marriage when the first marriage had in fact not been terminated"].)

image of the current offense. The same is true of the 1977 uncharged offense. The method of contact, the perpetration of the acts, and the physical force used are uncommonly similar to each other.'' As such, it is reasonable to say that the other offenses are logically relevant to prove defendant's intent, without regard to disposition, in the instant case.

The majority, finding no ultimate fact in issue, never reached the question of whether section 352 of the Evidence Code required exclusion of the evidence in spite of its relevance.

"Evidence of other crimes is not automatically admissible under subdivision (b) [of § 1101] whenever it is offered to prove an intermediate fact other than disposition. Subdivision (b) merely clarifies the fact that subdivision (a) 'does not prohibit' the admission of such evidence when it is offered to prove a fact other than disposition. (Cal. Law Revision Com. com. to Evid. Code, § 1101.) The evidence of other crimes must still satisfy the rules of admissibility codified in section[] . . . 352." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 317, fn. 17 [165 Cal.Rptr. 289, 611 P.2d 883].) Under section 352 the probative value of this evidence must outweigh its prejudicial effect. (See *People* v. *Guerrero* (1976) 16 Cal.3d 719, 727 [129 Cal.Rptr. 166, 548 P.2d 366].) Moreover, since " 'substantial prejudicial effect [is] inherent in [such] evidence' [citation omitted] uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt the evidence should be excluded." (*People* v. *Thompson, supra,* at p. 318 quoting *People* v. *Kelly, supra,* at p. 239.)

"The evidence is probative if it is material, relevant, and necessary. '[H]ow much "probative value" proffered evidence has depends upon the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy), the importance of the issue to the case (degree of materiality) and the necessity of proving the issue by means of this particular piece of evidence (degree of necessity). (*People* v. *Delgado* (1973) 32 Cal.App.3d 242, 249 [108 Cal.Rptr. 399] overruled on another point in *People* v. *Rist* (1976) 16 Cal.3d 211, 221 [127 Cal.Rptr. 457, 545 P.2d 833].)' " (*People* v. *Thompson, supra,* at p. 318, fn. 20.)

First, there is a high degree of relevance. As was true in *Thompson,* "[t]he theories of relevance advanced in this case are premised on the contention that if a person acts similarly in similar situations, he probably harbors the same intent in each instance." (*Thompson, supra,* at p. 319.) As I have noted, the evidence of other crimes is almost identical in its execution to the present instance. Thus, there is a high degree of relevance.

Second, the evidence must be material. In order for the evidence to be material, the fact to be proved must be an ultimate fact that is actually in

issue. (*Thompson, supra,* at p. 315.) Once again, as I have already demonstrated, intent is at issue as a consequence of defendant's assertion that he reasonably believed the prosecutrix consented.

Finally, it must be necessary. If the evidence is "merely cumulative with respect to other evidence which the People may use to prove the same issue," it should be excluded. (*People* v. *Schader* (1969) 71 Cal.2d at pp. 774, 775, fn. omitted [80 Cal.Rptr. 1, 457 P.2d 841].) There is no suggestion that the evidence of past crimes was mere duplication in the instant case. In fact the only other evidence going towards intent was the testimony of the victim which was directly contradicted by defendant's testimony.

The evidence is, as required, of *substantial* probative value: it is relevant, material, and necessary. Generally the trial court makes the determination whether evidence is more probative than prejudicial. However, since in the case at bench I agree with the majority that it was harmless error to introduce the evidence, if it was error at all, there is no need to remand.

**RICHARDSON, J.**\*—I concur in the judgment affirming defendant's conviction and remanding for resentencing.

I respectfully dissent, however, from the majority's disapproval of *People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433], and its analysis regarding the admissibility of evidence of prior crimes for the purpose of demonstrating a "common design or plan" on defendant's part. Contrary to the majority's assumption, the rule reaffirmed in *Thomas* (and applied in numerous earlier cases) allowed evidence of prior crimes not to establish defendant's general "disposition" (i.e., habitual tendency) to commit sex crimes, but instead to prove that, because he recently committed substantially similar offenses in a distinctively similar fashion, he probably also committed the present offense. As we stated in an earlier case, the common design or plan exception to the general rule forbidding "disposition" evidence (see Evid. Code, § 1101, subd. (b)) applies where "there is some clear connection between that [prior] offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other." (*People* v. *Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582]; see *Thomas* at p. 465.)

In view of the fact that recently adopted Proposition 8 seemingly has eliminated the barriers to admissibility of relevant "prior crimes" evidence

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

(see Cal. Const., art. I, § 28, subd. (d)), I will not devote too much effort to demonstrating the errors in the majority's analysis in this pre-Proposition 8 case. Suffice it to say that where, as here, the victim's *consent* to defendant's sexual acts is at issue, the fact that defendant has committed several recent and strikingly similar *nonconsensual* sex offenses is highly relevant to the consent issue and was properly brought to the jury's attention. *(People* v. *Jackson* (1980) 110 Cal.App.3d 560, 566 [167 Cal.Rptr. 915].)

As stated in *Jackson,* "Evidence of a prior offense is logically relevant to prove the defendant's intent if the prior offense was sufficiently similar in its commission to the charged offense to indicate that the defendant probably harbored the same intent in both instances. [Citation.] [¶] . . . Defendant's trial theory, that the victim had consented to the sexual acts, was tantamount to a denial that he had intended to achieve [those acts] by force or intimidation. Evidence of prior offenses was thus admissible to establish defendant's intent in the present offense by corroborating the victim's testimony that she had not consented to the sex acts, so long as those prior offenses were not too remote and were similar to the offense charged. [Citation.]" *(Ibid.)*

*Jackson's* rationale is fully applicable here and upholds the admission of evidence of defendant's prior recent and similar sex offenses.