Filed 1/4/18

# CERTIFIED FOR PARTIAL PUBLICATION\*

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LEMOE TUA et al.,<br><br>    Defendants and Appellants. | D069731<br><br><br><br>(Super. Ct. No. SCN323006) |

APPEALS from judgments of the Superior Court of San Diego County, Richard R. Monroy, Judge. Affirmed in part; reversed in part and remanded with directions.

Thomas E. Robertson, under appointment by the Court of Appeal, for Defendant and Appellant David Lemoe Tua.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Roland Isaac Seau.

---

\*      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the Factual and Procedural Background and parts I through V of the Discussion section.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Roland Isaac Seau of the crimes of murder in the first degree in the death of Louiegie Bermas with the personal use of a deadly weapon (Pen. Code,[1] §§ 187, subd. (a), 12022, subd. (b)(1), 186.22, subd. (b)(1)); the willful, deliberate, and premeditated attempted murder of Randy Lozano; assault with a deadly weapon on Lozano with the personal use of a knife and personal infliction of great bodily injury (§§ 187, subd. (a), 189, 245, subd. (a)(1), 664, 12022, subd. (b)(1), 12022.7, subd. (a)); and dissuading a witness, Vanessa Rivera. (§ 136.1, subd. (b)(1).) The jury found that each crime was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) In a bifurcated proceeding, Seau admitted two prison priors, a strike prior, and a serious felony prior. (§§ 667.5, subd. (b), 667, subds. (a)(1), (b)-(i).) He was sentenced to 102 years to life in prison.

The same jury found David Lemoe Tua guilty of aiding and abetting the crimes of murder in the second degree in the death of Bermas, and the willful, deliberate, and premeditated attempted murder and assault with a deadly weapon on Lozano. He was also found guilty of dissuading a witness. (§§ 187, subd. (a), 664, 189, 245, subd. (a)(1), 136.1, subd. (b)(1).) The jury found that each crime was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) In a bifurcated proceeding, Tua admitted a

---

[1] Unspecified statutory references are to the Penal Code.

strike prior, a serious felony prior, and a prison prior. The court sentenced Tua to 75 years to life in prison.

Seau and Tua (together, defendants) contend the denial of their motions to sever the trials resulted in grossly unfair trials and a denial of due process. They assert the court erred by not bifurcating the gang element from the substantive offenses and denying their motions for mistrial after law enforcement witnesses repeatedly vouched for the credibility of a witness. In an issue of first impression, they also contend the court erroneously imposed a consecutive five-year prior serious felony enhancement (§ 667, subd. (a)) as to the determinate sentence for assault with a deadly weapon, a count where sentencing was otherwise stayed pursuant to section 654.

Separately, Tua asserts there is no substantial evidence to support his conviction for second degree murder. In response to supplemental briefing requested by this court, he contends his convictions for attempted murder and assault with a deadly weapon are not supported by substantial evidence. Seau argues the pinpoint references to his name in jury instructions were prejudicial to him.

In the published portion of the opinion we hold that a prior serious felony enhancement imposed on a determinate sentence must follow the mode of sentencing imposed on at least one of the determinate counts. We accordingly reverse and remand the case to the trial court for resentencing. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Overview*

Seau and Tua were members of the Deep Valley Bloods (DVB), a criminal street gang operating in Oceanside. The primary criminal activities of the DVB included defacing buildings and structures with gang graffiti, vandalism, robbery, assault, attempted murder, and murder.

Seau lived in his aunt's home on Arthur Street, which was "ground zero" of the territory claimed by the DVB. His gang monikers were "Ro-Steady" or "Steady." He had numerous DVB gang tattoos, including the phrase "RIP Rusty Seau" across his neck.

Tua was a longtime member of the DVB. He was known as "Chops." He, too, had DVB gang tattoos. The phrase "Fuck a Snitch" was tattooed on the left side of his neck.

Lozano grew up in Fallbrook. He was a member of the Fallbrook Locos gang. In approximately 2008, when he was 20 years old, Lozano moved to an area of Oceanside claimed by the DVB as its territory. Lozano stole bicycles and gave them to Tua in exchange for methamphetamine. Lozano had a friend, Louiegie Bermas, who was a 21-year-old man of slight build. Bermas was not a gang member.

Vanessa Rivera lived on Arthur Street, across the street and three houses down from Seau. Rivera was a chronic methamphetamine user. She was Lozano's girlfriend. Rivera was also secretly involved with Tua.

Shortly after midnight on August 14, 2013, Lozano, Bermas, and Rivera were at an abandoned house on Charles Street, a block from Arthur Street. Seau, Tua, and two

4

other DVB members[2] (Bloods) arrived. Tua introduced Lozano as a member of another gang. Lozano was stabbed nine times by an assailant he later identified as Seau. He managed to escape. A short time later, Seau, holding Bermas by the arm, confronted Rivera and demanded she come with him. After she refused, Tua convinced Rivera to join them. He took Rivera to the backyard of Seau's next door neighbor. Seau and Bermas were in Seau's backyard. Seau was hitting, kicking, and stabbing Bermas, who died from his injuries.

*Lozano's Testimony and Evidence Related to His Assault*

Randy Lozano testified that when he first moved to the Arthur Street area, he had problems with the DVB. Lozano believed he had resolved those problems years earlier. DVB members who lived in the area called him "Puppet" and knew about his former gang affiliation. Lozano had known Tua for seven or eight years and never had any problems with him.

After midnight on August 14, Lozano, Rivera, and Bermas went to the backyard of an abandoned house on Charles Street to use methamphetamine. The abandoned building was a party house and gang hangout. On several prior occasions, Lozano had been in the house when DVB members were present, without incident.

Lozano testified he had taken a hit of meth when Tua and three other Bloods showed up. Tua came over to him and shook his hand. Lozano testified everything was "cool" with Tua, but some of the men Tua was with appeared to be drunk. Seau asked

---

[2] The two other DVB members were not identified.

Lozano and Bermas where they were from, meaning "*what gang are you from?*" Bermas said he was from Oceanside. Tua told the others Lozano was from Fallbrook. This was not an issue for Lozano because he had never had any problems with Tua. Nevertheless, Lozano was concerned about Rivera's safety. Gang members acted up when they were together.

Tua asked if Lozano could get them some dope. Lozano said he had some at his house but first he needed to take Rivera home. Tua stepped out of Lozano's way to allow him to leave. As they were leaving, Rivera told Lozano to wait for Bermas, who was at the back of the house with the two other Bloods. Tua and Seau walked out of the backyard together. They whispered something to each other.

Seau left briefly. When he returned, his right hand was wrapped in a towel. Tua and Seau were looking down the street. Lozano testified, "They were, like, tripping on headlights that were not coming." Seau told him to look. When Lozano looked in the direction Seau indicated, Seau attacked him, saying "Fuck Fallbrook" and "Deep Valley Blood gang." This meant Seau was attacking him for the gang. Lozano was surprised by the assault. Lozano testified Tua and Rivera were behind him, and Tua was not involved in the stabbing.

Lozano started running. His sweater was full of blood. Seau chased but could not catch him. Lozano ran next door to his friend's house and asked his friend to call an ambulance.

At approximately 2:45 a.m., a police officer responded to a call of assault with a deadly weapon. An ambulance arrived a few moments later. Lozano had suffered nine

6

stab wounds, including a wound that was inches away from his heart, several stab wounds in his shoulder, and a laceration that sliced halfway through his ulnar bone. There were multiple cuts to the ulnar nerve, resulting in severe, lasting injuries to his hand. All his injuries were to the front of his body.

*Rivera's Trial Testimony*

Vanessa Rivera testified she saw Tua and Seau and some other men at an abandoned house behind her house. Rivera asked Tua to leave because she was planning to meet Lozano there. People in the neighborhood who knew Lozano called him Puppet and knew he was from Fallbrook. Rivera said Tua and Lozano appeared to be friendly with each other but she was uncomfortable being in their company at the same time. Tua refused to leave. He said to Seau, "Puppet's coming. Let's go smoke his shit." Seau replied, "No. Fuck his shit."

Rivera telephoned Lozano and changed their meeting place to the backyard of another abandoned house on Charles Street. Lozano smoked meth. Before Rivera and Bermas could get high, Tua, Seau, and two other men showed up. Lozano shook hands with Tua. He introduced himself to the others as Randy. Tua introduced Lozano as "Puppet from Fallbrook." Rivera was apprehensive. Tua had his friends with him. Lozano did not have anyone to protect him if there was a fight.

Tua asked Lozano if he knew where to get some meth. Lozano said yes and added, "Let me just take my girl back home." Lozano started to leave. Rivera told him to wait for Bermas. Seau and another man were blocking Bermas from leaving. They

7

were asking him where he was from.  Lozano kept walking while Rivera waited for Bermas.

Seau left and came back quickly.  He was wearing a white tank top and had his shirt wrapped around his hand.  Seau swung at Lozano, saying "Deep Valley Bloods."  Rivera looked in Bermas's direction.  One of the other men was beating Bermas, who was bent over.  When Rivera looked back, Seau was by himself.  Tua was by her side.  She asked Tua and Seau about Lozano.  Seau said, "He ran."

Rivera returned home.  She was angry with Lozano for leaving her and Bermas.  Rivera walked by herself toward Arthur Street to go home.  She saw Bermas walking toward the street.  Rivera testified when Tua left, he went to talk to Seau's next door neighbor, Jason Cruz.[3]  Rivera arrived at her house.  Seau came over.  He had Bermas by the arm.  Seau told her to follow him to his house.  Rivera refused.  Tua came over, hugged her, and said, "He's drunk.  Nothing's going to happen."  They walked behind Seau and Bermas.  Tua had his arm around her waist.  One of the Bloods was behind them; the other was in front of Seau's house.

Seau and Bermas went into the backyard of Seau's house.  Tua took Rivera into Cruz's backyard.  The properties were divided by a brick wall, which was approximately four feet high.  The two other Bloods were there.  One of the men stayed in front to act as a lookout.

---

3    Rivera's home was on a corner of Arthur Street.  The abandoned Charles Street house was on the corner of the next cross street from her house.  Rivera would have walked past the Seau and Cruz homes on her way home.

8

When Rivera and Tua arrived, Seau was punching and kicking Bermas, who was against the brick wall. Rivera said she and Tua immediately yelled "stop." Seau was out of control. He was yelling "Deep Valley Bloods." Bermas said he wanted to go home; he wanted his mom. Seau held a pocketknife against Bermas's throat. Bermas said he could not breathe. He kept asking Seau, "What did I do?"

Rivera testified Seau's sister Desiree came out of the Seau residence. Bermas called for her. Desiree, who was pregnant, tried to intervene but Seau pushed her out of the way. Seau was breathing heavily. Rivera said, "[Seau] was really getting into really beating [Bermas]."

Tua and one of the other Bloods tried to stop Seau by reaching over the wall and grabbing Seau's arm. Seau just moved his arm. Rivera tried to leave but one of the Bloods stood in front of her and Tua grabbed her arm.

Rivera testified Cruz came out of his house and told them his mother-in-law was upset and wanted them to leave. Cruz walked over to the wall, looked at Bermas, and said, "Louiegie, shut up or I'm going to kill you myself." The lookout announced there were police officers at Rivera's house. Seau asked Bermas if Rivera was going to snitch. Tua yelled at Bermas, "Is this bitch going to snitch?" Bermas said yes. The Bloods started to panic. Rivera jumped over the fence in the back. Tua and one of the Bloods also jumped. When Rivera last saw Bermas, he was on the ground in Seau's backyard.

Rivera returned home at 5 a.m. She learned Lozano had been stabbed and was in critical condition at the hospital. Tua came to see her. Rivera told Tua the police were coming back to speak with her. Tua advised Rivera the police would try to scare her, but

9

she did not know anything. He hugged her and said he loved her. Rivera saw Seau walking around with his shirt off, eating a bowl of cereal "like nothing had happened." He came toward her. Seau and Tua looked at her and asked each other if she was "boo," which meant if she was okay or if she was going to say anything. Seau asked her, "Are you boo?" Rivera nodded at him and said "yeah." Seau stared at her for a minute. Tua came over, kissed her, and left without saying anything.

Rivera acknowledged she initially lied to police. She was afraid of Seau. Rivera was arrested on August 29 for helping Tua flee the scene of a crime. After her arrest, Rivera told police Tua had stabbed Lozano. She said that was what they wanted to hear.

*Testimony of Other Witnesses*

Jason Cruz testified he returned home drunk between 2:30 and 2:45 a.m. on August 14. While he was smoking a cigarette by his front door, he saw a group of men and a girl walking down the street from his right.[4] Two of the group looked like a guy and a girl hugging. Cruz did not recognize anyone. It was dark. He went back inside his house and made something to eat. His mother-in-law heard noises in the backyard and asked him to investigate. Tua and Rivera were in his yard. He saw Seau and two or three others in Seau's backyard. There was a kid leaning against the wall in Seau's backyard. Cruz thought he was intoxicated. He asked Tua and Rivera to leave his yard. They went over his fence and he went back inside. Cruz did not see anyone being hit or kicked. He denied he told Bermas to shut up.

---

[4] Based on Cruz's position, the group was walking from the direction of Rivera's house.

Desiree Seau denied witnessing the assault on Bermas. She said she was at her boyfriend's house that night.

At approximately 5:30 a.m. on August 14, a neighbor who lived two houses across the street from the Seau residence discovered Bermas's body by her mailbox and notified the police.

*Testimony of the Medical Examiner*

Bermas suffered a knife wound that severed his anterior tibial artery. His death was most likely caused by extensive blood loss. However, Bermas's hyoid bone was fractured and the medical examiner could not exclude strangulation as the cause of death. Bermas's scalp was split due to blunt force trauma. He had numerous other bruises, scrapes, and lacerations on his body. Because of the condition and position of Bermas's body and the evidence in the location where it was found, the medical examiner believed that Bermas's body was moved after his death.

*Physical Evidence*

The wall between the Seau and Cruz property was made of red and white bricks. Rivulet patterns on the red bricks were blood matching Bermas's DNA. Officers found a pair of white Converse tennis shoes with a red stripe in a garbage can at the Seau residence. The shoes appeared to have been cleaned. One of the shoes had a reddish-brown stain and a drop of Bermas's blood on it. Officers found a cell phone with a photo of Seau standing next to the brick wall in his backyard wearing white Converse tennis shoes with a red stripe. There were no injuries on Bermas's body consistent with having been kicked by any specific type of shoe. When police officers arrested Seau on August

11

15 on unrelated charges, he had fresh scrapes on the back of his right shoulder and back, and injuries on his hands.

*Law Enforcement Officers' Testimony*

Oceanside Police Department Gang Detective Bryan Campagna and Detective Douglas Baxter from the Crimes of Violence Unit interviewed Lozano in the hospital six or seven hours after the incident. Lozano was medicated and in pain. He identified the DVB as the suspect gang and said Tua had been at the scene. Lozano told officers that when Tua and the others arrived, Lozano said to him, "Hey, what's up?" When one of the other men asked Lozano where he was from, Tua responded, "He's cool. He's from Fallbrook." Lozano said Tua did not stab him. He did not know the stabber.

Campagna asked Lozano if he knew a person named "Roland Ro-Steady" or "Robert Seau," and said, "He has like tattoos on his throat and stuff." (Italics omitted) Lozano said, "I know who you're talking about," and described the Seau residence.

Baxter said Lozano was more cooperative than most witnesses in gang-related cases. When shown 15 photos of suspects during a second interview on August 15, Lozano said it was possible the person in photo No. 10 was the person who had stabbed him.[5] That person had ink on his neck and similar facial features to the person who had stabbed him. After his release from the hospital, Lozano said he remembered meeting "the person with ink on his neck who had stabbed him" in Rivera's backyard two weeks before the incident. That person warned him to remember he was in DVB territory.

---

[5] Photo No. 10 was a photo of Seau.

12

Oceanside Police Department Detective Marilyn Johnson testified that when Lozano said the men were Bloods, every DVB member in Oceanside became a suspect. In gang cases, witnesses usually lie to the police initially because they are afraid. To determine the facts in a gang case, Johnson had to interview each witness numerous times.

Johnson interviewed Rivera on August 14, 15, and 29, 2013. Johnson said she knew Rivera was lying during her interview on August 14, but some of the framework of her story stayed the same throughout the interviews. During the first interview, Rivera became hysterical when Johnson showed her a photo of Bermas lying dead in the street. Johnson filled in the gaps in Rivera's framework with corroborating details from other witnesses and physical evidence. Johnson testified that by the end of the investigation, it appeared Rivera was telling the truth. Rivera felt badly about Bermas.[6]

Rivera was arrested on August 29 and charged with a felony for helping Tua flee the scene of the crime. Campagna interviewed Rivera on August 29. Rivera said there was a large group of Bloods at the abandoned house behind her own home, and there was discussion about Lozano coming over. According to Rivera, Seau was very agitated at that time, "just kind of worked up over something." Rivera left and went to the abandoned house on Charles Street.

Campagna testified Rivera said that when Tua introduced Lozano as "Puppet from Fallbrook," Lozano became fearful. He started to leave. Rivera told him to wait for

---

6       Seau and Tua objected to Johnson's testimony. See discussion, part IV.B.

13

Bermas. Campagna said Rivera did not see the stabbing. She saw a punch. She was not sure who threw the punch. Campagna pressed her because he believed she was withholding information. He finally realized she may not have seen the assault on Lozano.[7] Campagna said near the end of a 10-hour interview, an FBI agent was pressuring Rivera. Rivera was tired. She said, "I guess I saw [Tua] stab [Lozano]." She then said, "No, no, no."

When Campagna asked her about Bermas, Rivera became very emotional and provided details of the assault. Rivera identified Seau as the perpetrator of the attack on Bermas.

*Gang Evidence*

Detective Campagna testified the DVB had 40 documented members, including Seau and Tua. The gang engaged in a pattern of criminal activity. The DVB's stronghold was the area surrounding Arthur Street. The DVB challenged people they believed did not belong in their territory. The question "*where are you from*" was a common gang challenge.

Campagna detailed several predicate offenses committed by DVB gang members, including Seau's convictions for felony vandalism in 2009 and attempted robbery in 2011. He also discussed an incident involving Tua in 2013.

*Seau's Defense Witnesses*

---

[7]    Seau and Tua objected to Campagna's testimony and made a motion for a mistrial. See discussion, part IV.B.

A forensic specialist testified that if Bermas had been kicked by a person wearing Converse tennis shoes, the shoes would have had more blood on them. An expert on memory said Lozano's identification of Seau as his assailant may have been the result of police suggestion during the photo lineup. Seau's photo was the only photo in the lineup showing a person with a tattoo on his neck.

*Closing Arguments*

The prosecutor argued that Seau attacked Lozano and killed Bermas, and that Tua assisted him. Lozano was attacked because he was an enemy of the Bloods and he was in their territory. Tua knowingly instigated the assault when he introduced Lozano as a member of a rival gang. Bermas was murdered because he was a friend of Lozano's in the wrong place at the wrong time. Rivera was silenced, temporarily, because she witnessed the attacks on Lozano and Bermas. Tua knew if he identified Lozano as a rival gang member, something ugly would happen to him. Therefore, Tua was guilty as an aider and abettor.

Seau claimed Lozano's identification of him as his assailant was tainted by suggestive police procedures. The police told Lozano the perpetrator had tattoos on his neck, then showed him a photo lineup in which Seau was the only subject with visible tattoos on his neck. The jury should not believe Rivera's testimony because it was contradicted by other witnesses, and her story kept changing until she was arrested.

Tua argued the evidence did not show beyond a reasonable doubt that he aided and abetted Seau's crimes, or tried to intimidate Rivera. His introduction of Lozano did not instigate the assault. Lozano had lived in the neighborhood for years. Everyone knew he

15

was from Fallbrook. The evidence showed that Tua did not attack, assist in an attack or threaten anyone, and that he tried to stop the attack on Bermas.

## DISCUSSION

### I. *Joinder*

### A. *The Parties' Arguments*

Defendants argue the joint trial resulted in gross unfairness to them.[8] Tua asserts he was denied due process because evidence of Seau's brutal acts was tethered to the weak case against him, his and Seau's strategies and defenses were contradictory, and Seau's defense allowed the prosecution to elicit hearsay that would not have been admissible in a separate trial. In addition, the joint trials allowed the prosecution to introduce and emphasize Seau's prior gang-related conduct, which prejudiced Tua.

Seau argues the joint trial forced him to defend against Tua's assertions he was the primary actor, which was akin to having a second prosecutor in the case.

### B. *Legal Principles and Standard of Review*

The Legislature has expressed a preference for joint trials. (§ 1098 [when two or more defendants are charged with any public offense, they must be tried jointly, unless the court orders separate trials].) Joint trials promote efficiency and serve the interests of

---

[8] In pretrial motions, Tua and Seau asked the court to sever their trials. In denying the motions, the court said the prosecution was not seeking to introduce any statements made by either defendant in evidence, and predicate gang acts would be admissible as to each defendant in a separate trial. Defendants do not claim the court abused its discretion when it denied their pretrial motions for severance.

16

justice by avoiding the inequity of inconsistent verdicts.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378-379 (*Bryant*).)

"A 'classic case' for a joint trial occurs when defendants are 'charged with the same crimes arising from the same events.' "  (*Bryant*, *supra*, 60 Cal.4th at p. 379.)  Important public policy interests are served "if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges."  (*Ibid.*)

"A prejudicial association justifying severance will involve circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant."  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.)  Factors to be considered include the cross-admissibility of the evidence in separate trials, whether some of the charges are likely to unusually inflame the jury against the defendant, and whether a weak case has been joined with a strong case and the total evidence may alter the outcome of some or all of the charges.  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220-1221.)

"Where a trial court's severance ruling is correct at the time it was made, a reviewing court will reverse the judgment if the defendant shows that joinder resulted in 'gross unfairness' amounting to a denial of due process.  [Citations.]  In determining whether there was such gross unfairness, we view the case as it was tried, including a review of the evidence actually introduced in the trial" and other trial related matters,

such as the prosecutor's closing argument. (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1434 (*Ybarra*).)

Appellant has the burden to establish gross unfairness. This is "a high burden." (*Ybarra*, *supra*, 245 Cal.App.4th at p. 1438.) "To establish gross unfairness amounting to a due process violation, a defendant must demonstrate a 'reasonable probability' that the joinder affected the jury's verdicts." (*Ibid.*) We review a federal due process claim de novo. (*Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1690.)

C. *Analysis*

1. *Tua does not meet his burden to show the joint trial resulted in gross unfairness to him.*

Tua asserts the combined evidence unfairly altered the outcome of the trial because the weak case against him was joined with a strong case against Seau. Tua characterizes the evidence of Seau's brutality as violent and inflammatory, and thus highly prejudicial. In support of his argument, Tua relies on *People v. Chambers* (1964) 231 Cal.App.2d 23 (*Chambers*), in which the reviewing court held that the joint trial was grossly unfair to the appellant and reversed the judgment. (*Id*. at pp. 28, 34.)

In *Chambers*, the prosecution alleged each defendant committed separate acts of violence on nursing home residents. Only one eyewitness incriminated Chambers. Her testimony was rebutted by other evidence. Characterizing the evidence against Chambers as "weak," the reviewing court stated the case was "heavily weighted with evidence of [the codefendant's] brutality" against the victims. (*Chambers*, *supra*, 231 Cal.App.2d at pp. 28-29.) The *Chambers* court concluded that in the absence of any charge of

18

concerted or conspiratorial action, in view of the weak evidence against him, the appellant was probably convicted by association with the other defendant and did not receive a fair trial. (*Id*. at p. 29.)

Unlike *Chambers*, this case involves charges of concerted action for the same crimes. The prosecutor explained to the jury that Seau was charged as the principal actor and Tua was charged as an aider and abettor. While the evidence shows that Seau committed brutal physical attacks, it also supports findings that Tua was aware of Seau's intent to assault each victim, that he worked with Seau to distract Lozano immediately prior to the assault, and that he helped Seau intimidate Rivera by forcing her to witness the attack on Bermas. (See, *post*, pt. III.C.) The prosecution presented "independent evidence supporting each defendant's participation in the group's mutual criminal endeavors." (*People v. Lewis* (2008) 43 Cal.4th 415, 461 (*Lewis*), on another issue, rejected by *People v. Black* (2014) 58 Cal.4th 912, 919-920 (*Black*).) Thus, the jury was able to assess "the guilt or innocence of each defendant on an individual and independent basis." (*U.S. v. Tootick* (9th Cir. 1991) 952 F.2d 1078, 1083 (*Tootick*).)

Tua also argues that conflicts in his and Seau's defenses and trial strategies undermined his right to a fair trial. He suggests that Seau emphasized Rivera's identification of Tua as the person who stabbed Lozano. Further, Seau refused to stipulate Tua did not stab Lozano.

The federal Constitution does not compel severance when codefendants present conflicting defenses. (*Bryant*, *supra*, 60 Cal.4th at p. 379.) "Simply because the prosecution's case will be stronger if defendants are tried together, or that one defense

19

undermines another, does not render a joint trial unfair." (*Ibid*.)  We are not persuaded defendants presented conflicting defenses.  The prosecution did not argue that Tua stabbed Lozano, thus Tua did not have to defend himself against that claim.  Seau's trial strategy was simply to create doubt about Lozano's identification of him as his assailant.

"[A]ntagonistic defenses do not warrant severance unless the acceptance of one party's defense would preclude acquittal of the other party." (*Lewis*, *supra*, 43 Cal.4th at p. 461, rejected on other grounds by *Black*, *supra*, 58 Cal.4th at p. 919.)  Here, Seau's claim the witnesses misidentified him as the assailant would not have precluded Tua's acquittal on charges of aiding and abetting.  To the contrary, Seau's acquittal on charges of murder, attempted murder, and assault with a deadly weapon would have supported Tua's claim he did not aid and abet Seau in the commission of those crimes.

We also reject Tua's claim he was prejudiced by the admission of evidence showing Seau committed prior brutal acts of gang-related violence.  Evidence of Seau's prior gang-related convictions would have been admissible in a separate trial to prove predicate acts on the gang enhancement allegations.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 (*Hernandez*).)  Similarly, evidence of Seau's brutal acts against Lozano and Bermas would have been admissible in a separate trial to prove that Tua aided and abetted those acts.

This case presents a classic case for a joint trial.  The defendants are charged with the same crimes arising from the same events.  (*Bryant*, *supra*, 60 Cal.4th at p. 379.)  In view of the trial evidence and other pertinent matters related to the trial, Tua has failed to

20

"show a 'reasonable probability that the joinder affected the jury's verdicts.' " (*Ybarra*, *supra*, 245 Cal.App.4th at pp. 1440-1441.)

2.     *Seau's argument Tua acted as a "second prosecutor" is without merit.*

Seau asserts the trial was grossly unfair to him because Tua acted as a "second prosecutor" and launched an "all-out attack" on him, forcing him to defend against Tua's assertions he was the primary actor and was totally out of control. This argument lacks merit.

The record does not support Seau's claims. While the prosecution asserted that Seau was the primary actor, Tua argued the evidence did not demonstrate beyond a reasonable doubt that he aided and abetted Seau. In his closing argument, Tua said the evidence showed he tried to stop "*the person who was attacking* [*Bermas*]" by reaching over the wall and grabbing "*that individual*." This is not an argument a prosecutor would make in trying to persuade a jury Seau was guilty of murder, attempted murder, and assault with a deadly weapon. Seau points to the fact that Tua argued the scratches on Seau's shoulder corroborated testimony he tried to stop the attack on Bermas by grabbing Seau, but in so doing, Tua simply wanted to demonstrate his own innocence, not to do everything possible to convict his codefendant. (*Tootick*, *supra*, 952 F.2d at p. 1082.)

The defendants did not present mutually exclusive defenses, which would tend to exonerate one defendant by implicitly indicting the other. (*Tootick*, *supra*, 952 F.2d at pp. 1082-1083.) As we noted earlier, the prosecution's theory was that Seau was the principal actor and Tua helped him. The prosecution did not argue Tua assisted Seau *or an unidentified perpetrator* in committing the crimes. On the contrary, the court

21

instructed the jury, in relevant part: "To prove that David Tua is guilty of Murder, the People must prove beyond a reasonable doubt that . . . [d]uring the commission of an assault with a deadly weapon upon Louiegie Bermas or attempting to dissuade a witness from reporting a crime[,] a co-participant in those crimes, Roland Seau, committed the crime of Murder." Therefore, Seau's acquittal on the charge of murder would have effectively required Tua's acquittal as his aider and abettor. We conclude that Tua's trial strategy did not lessen the prosecution's burden of proving the charges against Seau, and did not result in gross unfairness amounting to a denial of due process to his codefendant. (*Ibid*.)

## II.  *Gang Evidence*

A.  *The Parties' Arguments*

Tua asserts the failure to bifurcate the gang element from the trial on the substantive offenses allowed the jury to consider extraordinarily prejudicial evidence and denied him his right to a fair trial. He argues in view of the fact he did not affirmatively dispute his gang membership, the prosecution improperly used the gang evidence to argue he was a bad person with a propensity for violence.

Seau contends the erroneous admission of his prior convictions as gang predicates, and to prove motive and intent, deprived him of his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution. He argues the gang evidence was more prejudicial than probative and was improperly used by the prosecution to argue he had the propensity to commit the substantive crimes. Seau asserts the court abused its

discretion in admitting such evidence because it permitted the jury to infer guilt from cumulative and unnecessary evidence not admitted for that purpose.

The People maintain that the trial court did not abuse its discretion by permitting the prosecutor to introduce evidence of Seau's 2009 conviction to prove motive and intent, and his 2009 and 2011 convictions to prove the predicate offense for the gang enhancement. They insist evidence of Tua's gang affiliation was admissible to show his motive and intent in aiding and abetting the charged offenses and would have been admissible had the court bifurcated the gang elements. In addition, the gang enhancements and the charged offenses were intertwined, rendering bifurcation inappropriate. The People argue the gang evidence was less inflammatory than the charged offenses, therefore the failure to bifurcate the gang element did not unfairly prejudice the defendants.

B. *Additional Facts*

The prosecution filed a motion to admit in evidence gang expert testimony and copies of court records of crimes committed by DVB members, including Seau. Seau objected to the admission of two of his felony convictions to establish predicate acts, stating that evidence of prior bad acts was inherently inflammatory and dangerous. He offered to stipulate the DVB was a criminal street gang. Tua objected to the admission of Seau's prior convictions on the ground such evidence would have a spillover effect on the jury's determination of his culpability as an aider and abettor, and moved to bifurcate the gang element.

23

The court denied the motion for severance and ruled the gang evidence was admissible to prove the gang enhancement allegations under Penal Code section 186.22 and to show motive and intent under Evidence Code section 1101.[9] The court allowed into evidence the 2009 case involving Seau's vandalism and battery, and allowed limited evidence of his 2011 robbery conviction to show that Seau admitted to being a DVB member.

Before allowing witnesses to testify about Seau's prior felony convictions, the court gave the following limiting instruction to the jury: "[T]he evidence you are about to receive is limited only to Mr. Seau. It in no way can be considered as to Mr. Tua. It is limited to consider if Mr. Seau acted with intent and/or motive to commit the crimes and/or allegations charged in this case. And it cannot be considered for any other purpose."

Lieutenant Taurino Valdovinos testified that in 2009, a car driven by a member of the Mesa Locos, a rival gang, broke down in DVB territory. Seau broke the driver's side window and assaulted the driver, yelling, "This is DVB Bloods, fuck Mesa." In 2011, Valdovinos arrested Seau on a charge of attempted robbery. During an interview, in response to a question whether he was "born and raised" in the DVB, Seau said, "pretty much."

---

9      Evidence Code section 1101, subdivision (b) allows the admission of otherwise prohibited character evidence when relevant to prove a fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, other than the defendant's disposition to commit such an act.

The court admitted into evidence testimony about Tua's involvement in an earlier gang-related incident. Detective Campagna testified he was on patrol with his partner in the 600 block of Arthur Avenue in January 2013 when they saw a person riding a bicycle. Campagna and his partner were in plain clothes in an unmarked car. Campagna recognized Tua, who was throwing gang hand signs at them. The officers drove around the corner and saw Tua hiding behind a car. He appeared to be drawing a handgun out of his pants. The officers drew their guns and directed Tua to put his hands up. He immediately complied. Tua said he thought the officers were the enemy; that they were Crips driving through his neighborhood.

After the close of evidence, the trial court instructed the jury with CALCRIM No. 1403: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged; [¶] or the defendant had a motive to commit the crimes charged; [¶] or the defendant acted with the requisite specific intent or mental state for the crimes or allegations charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

In his closing argument, the prosecutor described the incident in which Seau attacked a person whose car had broken down in DVB territory, yelling "DVB Bloods,

25

fuck Mesa." He compared the incident to Seau's assault on Lozano, saying, "This is who Roland Seau is." The court sustained Seau's objection to the improper use of evidence and struck the prosecutor's remark. The prosecutor then said, "This is what Roland Seau does. He's a gang member who attacks rivals who don't belong."

The prosecutor told the jury that Tua set up a confrontation with Lozano knowing that Seau "was spoiling for a fight." Tua wanted Lozano dead because of his relationship with Vanessa. Tua was a longtime, entrenched DVB member who knew if he said the right words, something very ugly would happen to Lozano. The prosecutor said, "That's who David Tua is." Referring to the "Fuck a Snitch" tattoo on Tua's neck, the prosecutor argued that Tua assisted Seau in intimidating Rivera by making her "[watch] somebody die."

In his rebuttal argument, the prosecutor referred to the defendants' arguments the gang evidence was not part of any determination of their guilt on the substantive offenses. He said, "the jury instructions that you have been given about where and how you can use gang evidence include the following: Motive, intent, and whether or not the gang allegation has been proven. The instruction specifically said that gang evidence is admissible to prove motive. So to suggest otherwise is just plain wrong and a misapplication of the law."

C. *Legal Principles and Standard of Review*

The California Supreme Court recognizes that the "admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged."

26

(*People v. Williams* (1997) 16 Cal.4th 153, 193.) "[E]ven where gang membership is relevant, because it may have a highly inflammatory impact on the jury[,] trial courts should carefully scrutinize such evidence before admitting it."[10] (*Williams*, at p. 193.) This especially applies when the gang evidence is "extraordinarily prejudicial, and [has] so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.)

At the same time, the Supreme Court has also acknowledged that "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez, supra*, 33 Cal.4th at p. 1049.) In addition, evidence of defendants' gang involvement may be probative in explaining why a witness might be reluctant or afraid to testify. (See *People v. Harris* (1985) 175 Cal.App.3d 944, 957 (*Harris*).)

To sustain a criminal gang enhancement allegation, "the prosecution may . . . present expert testimony on criminal street gangs. [Citation.] Some of the evidence produced to establish this enhancement may be inadmissible to prove the underlying crime." (*Hernandez*, *supra*, 33 Cal.4th at pp. 1047-1048.) "Evidence of a person's *character,* also known as propensity evidence, is inadmissible to prove conduct

_____

10    Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

in conformity with that character trait."  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1170 (*Morales*); Evid. Code, § 1101, subd. (a).)  When a defendant's uncharged acts are admitted under Evidence Code section 1101, subdivision (a) for "a relevant purpose *other* than to support a propensity inference, an instruction is often given that explains this limited purpose to the jury.  (§ 355; CALCRIM No. 375.)"  (*Villatoro*, at p. 1171.)

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion."  (*People v. Avila* (2006) 38 Cal.4th 491, 575 (*Avila*).)  The decision on whether gang evidence is relevant, not unduly prejudicial and thus admissible, is committed to the sound discretion of the trial court.  We review de novo whether the defendant obtained a fair and impartial trial.  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225 & fn. 7.)

D.  *Analysis*

1.      *The court properly denied the motion to sever the gang allegations.*

We first address the issue whether the trial court abused its discretion in denying the motion to bifurcate the gang allegations from the trial on the substantive offenses.  A trial court has discretion to bifurcate the determination of a gang enhancement.  (*Hernandez, supra*, 33 Cal.4th at p. 1048.)  Generally, there is less need to bifurcate gang enhancements because gang enhancements are usually "inextricably intertwined" with the charged offenses.  (*Ibid.*)  "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary."  (*Id.* at pp. 1049-1050.)

The record shows the trial court acted within its discretion when it denied Tua's motion to bifurcate the determination of the gang enhancement from the underlying crimes. The gang enhancement was "inextricably intertwined" with the substantive offenses. (*Hernandez, supra*, 33 Cal.4th at p. 1048.) When Tua identified Lozano as a member of another gang, gang culture—including the culture of protecting a gang's territory from rival gangs—became relevant. Seau shouted gang names when he attacked Lozano and Bermas. Thus, Seau's 2009 conviction for assaulting, and yelling gang names at, a member of a rival gang whose car had broken down *in DVB territory* was probative on the issues of motive and intent. And Tua's encounter with police in January 2013, when he pulled a gun on what he believed were rival gang members *in DVB territory*, was also relevant to show motive and intent.

Similarly, when Tua asked Bermas if Rivera was going to snitch, evidence of gang culture regarding "snitches"—including Tua's "Fuck a snitch" tattoo—became pertinent. Gang evidence also served to explain why Tua participated in the crime of witness intimidation, addressing such guilt issues as motive and intent. (See *Hernandez, supra*, 33 Cal.4th at p. 1051.) In addition, evidence of defendants' gang involvement was probative in explaining why many of the witnesses were reluctant or afraid to testify. (See *Harris, supra*, 175 Cal.App.3d at p. 957.) The evidence supporting the gang enhancement would therefore be admissible at a trial on the substantive offenses. Thus, based on the facts as they appeared at the time the court ruled on the motion (*Avila, supra*, 38 Cal.4th at p. 575), any inference of prejudice is dispelled and bifurcation was not necessary (*Hernandez,* at p. 1049).

29

2.      *The admission of the gang evidence did not deprive defendants of a fair trial.*

Seau argues that evidence of his prior acts was more prejudicial than probative, and the erroneous admission was so serious as to have violated his right to due process by rendering the trial fundamentally unfair.  (See *People v. Partida* (2005) 37 Cal.4th 428, 436.)  He asks this court to revisit *People v. Tran* (2011) 51 Cal.4th 1040 (*Tran*), in which the California Supreme Court held that a predicate offense necessary to prove the substantive crime of active participation in a criminal street gang (§ 186.22, subd. (a))[11] may be established by evidence of an offense the *defendant* committed on a separate occasion.  (*Tran*, at p. 1044.)

Tua contends he was prejudiced by the evidence of Seau's prior acts because the instruction the jury could consider such evidence only as to Seau was likely ineffective, particularly in view of the prosecutor's failure to distinguish between the defendants during his closing argument.  Defendants collectively assert that the prejudicial effect of the gang evidence was magnified when the prosecutor used it to argue that defendants were bad people and had a propensity to commit gang-related crimes.

Although *Tran* held that a predicate offense may be established by evidence of a prior act committed by the defendant on trial, the opinion provides a cautionary guide to admitting such prior acts in evidence.  The *Tran* court recognized that "[w]ithout doubt,

_____

11      Defendants were not charged with a violation of section 186.22, subdivision (a), which is a substantive offense.  Instead, the People alleged defendants committed the substantive criminal offenses for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members.  (§ 186.22, subd. (b)(1).)

evidence a defendant committed an offense on a separate occasion is inherently prejudicial." (*Tran*, *supra*, 51 Cal.4th at p. 1047.) However, *Tran* also recognizes the long-standing principle that "Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*Tran*, at p. 1047.) *Tran* explains that the probative value of such evidence is enhanced if it is from a source independent of the evidence of the charged offense; if the Evidence Code section 1101, subdivision (b) evidence tends to establish an intermediary fact from which the ultimate fact of guilt of a charged crime can be inferred; and when the evidence provides direct proof of ultimate facts necessary to a conviction. (*Tran*, at p. 1048.) The court stated the potential for prejudice is decreased when testimony describing defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense, thus implicitly cautioning against the admission of highly inflammatory uncharged acts or evidence that is merely cumulative regarding an issue not reasonably subject to dispute. (*Id.* at pp. 1047-1048.)

Here, the trial court limited evidence of Seau's prior acts to the 2009 case involving vandalism and battery, and his 2011 robbery conviction in which he admitted to a police officer that he was a DVB member. The facts of the 2011 case were not described to the jury. The court instructed the jury it could only consider evidence of the prior acts to determine Seau's motive and intent to commit the present offenses. It also

allowed evidence of the January 2013 incident in which Tua pulled a gun on undercover officers who he believed were members of a rival gang in DVB territory.

As we have discussed, the gang evidence was probative on issues of motive and intent, and to explain why many witnesses were reluctant or afraid to testify, or were not truthful during the investigation or when testifying. In view of the other evidence presented at trial showing that he was a DVB member, Seau cannot show that the admission of the fact he was convicted in 2011 of attempted robbery posed an intolerable risk to the fairness of the trial or the reliability of the outcome. Moreover, the details of Seau's 2009 case are sufficiently similar to the present case—yelling "Deep Valley Bloods" and "fuck [the rival gang]" while attacking individuals who were in what he considered to be DVB territory—to be highly probative on the issues of motive and intent. The evidence was also relevant to show that defendants were members of a criminal street gang. Although other evidence tended to show gang membership as well, the defense cannot compel the prosecution to present a "sanitized" version of its case. (*Tran*, *supra*, 51 Cal.4th at p. 1049, citing *People v. Salcido* (2008) 44 Cal.4th 93, 147.) The facts of the prior incidents were not as egregious as the current case; thus, Seau does not show the evidence was substantially more prejudicial than probative. (Evid. Code, § 352.)

However, even if the trial court did not err when it admitted the gang evidence, including defendants' prior acts, we must consider the prejudicial effect of that evidence in view of the prosecutor's improper argument that defendants had a propensity to commit gang-related crimes. Tua also asserts the prosecutor impermissibly used

32

evidence of Seau's prior bad acts against him by arguing that the gang evidence was relevant to a determination of guilt on theories of motive and intent. When the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant.' [Citations.] However, if federal constitutional error is involved, then the burden shifts to the state 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Bolton* (1979) 23 Cal.3d 208, 214 (*Bolton).)*

We are not persuaded by the argument that the prosecutor's errors in closing argument rendered the trial fundamentally unfair. As we have discussed, the trial court did not err when it denied the motion to bifurcate the gang enhancement allegations, which were inextricably intertwined with the substantive offenses. The court appropriately limited the admission of prior acts. (*Tran*, *supra*, 51 Cal.4th at p. 1049 [probative value of the evidence of prior acts inevitably decreases with each additional offense, while its prejudicial effect increases].) And it limited the jury's consideration of Seau's prior bad acts to Seau alone. The court further instructed the jury that its consideration of evidence of gang activity was limited to deciding the gang-related enhancements charged and whether the defendant had a credible motive or acted with the

33

requisite specific intent or mental state for the crimes or allegations charged. The jury was instructed it could also consider the gang evidence in evaluating the credibility of a witness, and the facts and information relied on by an expert witness in reaching his or her opinion. At the same time, the court made it abundantly clear how the evidence could *not* be used: "You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

We are nonetheless troubled by the prosecutor's statements about Seau's and Tua's bad character and their disposition as gang members to commit crime. In describing Seau's prior gang convictions, the prosecutor said, "This is who Roland Seau is." After the trial court struck the prosecutor's argument about Seau's bad character, the prosecutor said, "This is what Roland Seau does. He's a gang member who attacks rivals who don't belong." A short time later, the prosecutor told the jury that Tua was a longtime, entrenched DVB member, and said "That's who David Tua is." Defendants did not object to these additional arguments seemingly linking their gang membership with their disposition to commit crime.

Assuming, without deciding, the issue has not been forfeited on appeal, the record shows that any reasonable jury would have reached the same verdict in the absence of the prosecutor's remarks. (*Bolton*, *supra*, 23 Cal.3d at p. 214.) Contrary to Seau's assertion, the evidence identifying him as the individual who attacked Lozano and Bermas is not weak. Although Rivera initially identified Tua as Lozano's assailant, the record shows that Lozano was attacked from the front. Lozano had known Tua for years and could

34

have easily identified him as his assailant. Instead, Lozano said Tua was behind him when the assault occurred and was not physically involved in the stabbing.

Further, any argument about Rivera's identification of Seau as the person who assaulted Lozano does not apply to her identification of Seau as Bermas's assailant. Rivera testified she saw Seau beating and kicking Bermas. She said, "[Seau] was really getting into really beating [Bermas]." Rivera's testimony was corroborated by Jason Cruz, who said he saw Seau and "a kid leaning against the wall" in Seau's backyard, and Tua and Rivera in the Cruz backyard. Bermas's DNA was recovered from the wall on the Seau property. The record shows that Seau had a pair of Converse tennis shoes that were identical to a pair of Converse tennis shoes in Seau's size found in a trash can on the Seau property. The tennis shoes had a bloodstain matching Bermas's DNA. When arrested shortly after the murder, Seau had fresh scrapes and scratches on his hands and shoulder. Thus, it is not " 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant.' " (*Bolton*, *supra*, 23 Cal.3d at p. 214; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*).)

We are not persuaded by Tua's argument the jury did not heed the trial court's instructions to limit its consideration of Seau's prior acts to Seau alone. The prosecutor told the jury it could consider gang evidence to determine motive, intent, and whether the gang element had been proven. This is an accurate synopsis of the court's instruction to the jury. The gang evidence admitted at trial included the 2013 incident in which Tua engaged in throwing gang signs and started to draw a gun on persons he believed were

35

rival gang members in DVB territory. We presume the jury heeded the admonition that the evidence of Seau's prior acts could not be considered as to Tua or for any other purpose other than to determine motive and intent, and the gang enhancement allegations. (*People v. Wash* (1993) 6 Cal.4th 215, 263 (*Wash*) [a reviewing court presumes the jury heeded an admonition and that any error was cured].)

### III. *Tua's Substantial Evidence Claims*

A. *The Parties' Arguments*

Tua contends there is insufficient evidence to support his convictions for aiding and abetting the attempted murder and assault with a deadly weapon on Lozano, and the second degree murder of Bermas. The People argue the evidence, when interpreted in the light most favorable to the verdict, shows that Tua instigated a gang-related assault on Lozano and then used the later assault on Bermas to intimidate Rivera. Thus, there is substantial evidence to support the prosecution's theories regarding Tua's liability as an aider and abettor.

B. *Legal Principles and Standard of Review*

"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161 (*Chiu*).)

"Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (*In re Michael T*. (1978) 84 Cal.App.3d 907, 911.) "To be liable for a crime as an abettor, the accused must have instigated or advised the commission of the crime or have been present for the purpose of assisting the crime. He must share the criminal intent with which the crime was committed." (*People v. Boyd* (1990) 222 Cal.App.3d 541, 556 (*Boyd*).)

Aider and abettor liability can take two distinct forms. " '[A]n aider and abettor with the necessary mental state is guilty of the intended crime. . . .' " (*Chiu*, *supra*, 59 Cal.4th at p. 158.) However, " 'under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Ibid.*)

"Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget

37

offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 [inquiry is strictly objective and does not depend on defendant's subjective state of mind].) It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*Chiu*, *supra*, 59 Cal.4th at pp. 165-166.) The issue is a factual question for the jury in view of all the circumstances surrounding the incident. (*Nguyen*, at p. 531.)

The reviewing court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 (*Johnson*).) Substantial evidence is evidence which is reasonable, credible, and of solid value such that a trier of fact could find the defendant guilty beyond a reasonable doubt. (*Id*. at p. 578.) In determining whether there is substantial evidence, the appellate court " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Id.* at p. 576.) The issue is resolved in view of the entire record and is not limited to the evidence favorable to the respondent. (*Id*. at p. 577.) The respondent cannot "simply . . . point to 'some' evidence supporting the finding" because not every apparent conflict of evidence remains substantial in view of other facts. (*Ibid*.)

C. *Analysis*

The People assert that Tua is guilty of attempted murder, assault with a deadly weapon, and murder because he instigated a gang-related assault on Lozano and used the assault on Bermas to threaten Rivera. A defendant may be liable for a crime as an aider and abettor if he instigated the commission of the crime and shares the criminal intent with which the crime was committed. (*Boyd*, *supra*, 222 Cal.App.3d at p. 556.) Thus, the People argue, there is substantial evidence to show that Tua aided and abetted the attempted murder and assault on Lozano, and that Bermas's murder was a natural and probable consequence of the assault on him or dissuading Rivera from reporting the assault on Lozano.

We are not persuaded the record supports the prosecution's theory that Tua instigated the assault on Lozano. The record shows that Lozano had lived in the Arthur Street neighborhood since 2008. People in the neighborhood who knew Lozano called him Puppet and knew he was from Fallbrook. Approximately two weeks before the assault, Seau warned Lozano to remember that he was in DVB territory. On August 13, the evening of the attacks, Tua said to Seau, "Puppet's coming. Let's go smoke his shit." Seau responded, "Fuck his shit." Rivera said Seau was "just kind of worked up over something" before going to the abandoned house. He appeared to be very agitated. When the Bloods arrived, Seau and one of the unidentified Bloods started asking Lozano and Bermas, "Where are you from?" According to the prosecution's gang expert, "*Where are you from*" is a common gang challenge.

During his first interview with law enforcement, Lozano said when Tua and the others arrived, Lozano said to Tua, "Hey, what's up?"  When one of the other men asked Lozano where he was from, Tua said, "He's cool.  He's from Fallbrook."  At trial, during direct examination, Lozano said Tua came over to shake his hand and he was not concerned when Tua told the other gang members he was from Fallbrook.  On redirect, Lozano testified Tua said "Falllll brook" in a manner that instigated the stabbing.  On recross-examination, Lozano acknowledged he told police officers the Bloods did not respond to Tua's remark and everything was cool.  When Lozano decided to leave, Tua stepped out of his way to allow him to do so.

Rivera testified Tua introduced Lozano to the Bloods as "Puppet from Fallbrook."  When asked by the prosecutor if there was a problem between Lozano and the Bloods at that point, Rivera said, "it just felt weird for me a bit."  On cross-examination, Rivera acknowledged Tua said, "He's cool.  He's Puppet from Fallbrook."  On redirect, Rivera testified Tua never used the word "cool."  Rivera said Tua introduced Lozano by his gang name because "he wanted to start something, I guess."

On review, contradicted evidence may support a determination there is substantial evidence to support the jury's findings, but not every apparent conflict of evidence remains substantial in light of other facts.  (*Johnson*, *supra*, 26 Cal.3d at p. 576.)  In view of the facts that Seau knew Lozano's identity before arriving at the abandoned house and challenged Lozano by asking "*Where are you from*?" we conclude there is insufficient evidence to support the particularized assertion that Tua instigated the assault by identifying Lozano as "Puppet from Fallbrook."  However, this determination does not

40

end our review of the entire record for substantial evidence to support the jury's findings. Based on that review, we conclude there is substantial evidence to support the finding that Tua was liable as an aider and abettor for the crimes against Lozano and Bermas.

1.    *There is sufficient evidence to show that Tua aided and abetted the crimes of attempted murder and assault with a deadly weapon on Lozano.*

The court did not instruct the jury on the natural and probable consequences doctrine for attempted murder and assault with a deadly weapon on Lozano. Therefore, to prove Tua's guilt of attempted murder as an aider and abettor, the prosecution had to show that he "g[a]ve aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624 (*Lee*).) Here, the record contains substantial evidence to support Tua's convictions of attempted murder and assault with a deadly weapon as an aider and abettor.

The record shows that Lozano saw Tua and Seau walking out together from the backyard of the abandoned house. They were whispering to each other. Seau left and came back. His hand was wrapped in a shirt, apparently to conceal a knife. When Seau returned, he and Tua were "trippin' on headlights that were not coming." Seau told Lozano to "look" in the direction in which he and Tua were focusing. As soon as Lozano's attention was diverted, Seau assaulted Lozano with a knife, stabbing him near his heart several times, and inflicting other serious injuries.

41

The record supports the reasonable inference that Tua knew of, and shared, Seau's intent to murder Lozano by stabbing him with a knife. Tua's knowledge of Seau's intent to kill can be inferred from their whispered conversation and Seau's immediate departure to retrieve a knife, followed by his attack on Lozano as soon as Tua helped divert Lozano's attention. Tua's pretense of looking at nonexistent car headlights allowed Seau to surprise Lozano and gain the advantage in the attack, and allows the reasonable inference the attempted murder was willful, deliberate, and premeditated.

Our conclusion Tua shared Seau's criminal intent to murder Lozano is further supported by Tua's failure to warn Lozano of Seau's plan or advise Lozano to flee, and Tua's lack of intervention, either verbally or physically, during the stabbing. Tua argues on appeal there is no evidence to show the content of his and Seau's whispered conversation and, therefore, it is mere speculation that the communication concerned the attack on Lozano. But the sequence of events before and after the stabbing permits the reasonable inference Tua was aware of Seau's plan. We conclude there is substantial evidence to show that Tua knew of Seau's intent and facilitated his attempt to kill Lozano by distracting him, thereby demonstrating his own intent to kill. Tua, therefore, is guilty of the substantive crimes as an aider and abettor. (*Lee*, *supra*, 31 Cal.4th at p. 624.)

2.      *There is sufficient evidence to show that Bermas's murder was the natural and probable consequence of Tua's aiding and abetting the crime of witness intimidation.*

Tua argues the natural and probable consequences doctrine traditionally applies to establish murder as the natural and probable consequence of assault with a deadly weapon, assault by means likely to cause serious injury, or robbery, but not to the crime

42

of witness intimidation. (*People v. Leon* (2008) 161 Cal.App.4th 149, 160-161 (*Leon*).) Tua concedes there is no published authority on point but contends *Leon* supports his position.

In *Leon*, appellant aided and abetted the crimes of vehicle burglary and illegal possession of a weapon by a member of a criminal street gang. (*Leon*, *supra*, 161 Cal.App.4th at p. 152.) After a victim threatened to call the police, a codefendant threatened the victims by firing a gun into the air. (*Id.* at pp. 153-154.) This court held that the crime of witness intimidation was not a natural and probable consequence of either vehicle burglary or illegal possession of a weapon, despite the increased risk of violence from the gang-related crimes. There was insufficient evidence to show that Leon aided and abetted the crime of witness intimidation because there was not " 'a close connection' " between the target crimes Leon aided and abetted and his codefendant's commission of witness intimidation. (*Id.* at p. 161.)

"There must be a close connection between the target crime a defendant aids and abets and the offense actually committed." (*People v. Hoang* (2006) 145 Cal.App.4th 264, 269 (*Hoang*).) "The question whether an offense is a natural and probable consequence of a target offense is to be determined 'in light of all of the circumstances surrounding the incident.' " (*Leon*, *supra*, 161 Cal.App.4th at p. 158.) We agree with the general principle that murder is not necessarily a natural and probable consequence of witness intimidation. For example, murder is not necessarily a foreseeable consequence of making a threatening verbal statement, social media post, or telephone call. However, where the evidence shows that a violent crime is used to perfect the intimidation of the

43

witness, then there is the requisite "close connection" between "the target crime a defendant aids and abets and the offense actually committed." (*Hoang*, at p. 269.)

Here, the record shows Tua had just facilitated Seau's brutal and unprovoked attack on Lozano. Tua knew that Seau was armed with a knife. Bermas had witnessed the attack on his friend Lozano. Seau had Bermas by the arm and was trying to get Rivera—who was present during the assault on Lozano—to come with him. When Tua realized that Seau was having difficulty persuading Rivera to accompany him, Tua walked over and told her to come along, saying "[n]othing [was] going to happen." Tua held Rivera around the waist as they followed Seau and Bermas. The two unidentified gang members were also nearby. The record permits the reasonable inference Tua's presence and the presence of other gang members discouraged Bermas and Rivera from trying to leave, and facilitated Seau's plan to intimidate Rivera by making her watch Bermas's beating.

Instead of following Seau and Bermas into Seau's backyard, Tua took Rivera to Cruz's backyard, which was separated from the Seau property by a brick wall. If Tua truly believed "[n]othing [was] going to happen," he would have had no need to put a brick wall between Rivera and Seau. Tua prevented Rivera from leaving the Cruz backyard by grabbing her arm. When Seau asked Bermas if Rivera was going to snitch and Bermas did not immediately answer, Tua shouted at him, "Is this bitch going to snitch?" Tua's intent to dissuade Rivera from reporting Seau's attack on Lozano is further corroborated by evidence showing that a few hours later, he and Seau, in Rivera's

presence, asked each other if Rivera was "boo," meaning if she would remain silent or if she would talk to the police.

" 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.' "  (*Chiu*, *supra*, 59 Cal.4th at p. 164, quoting *People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.)  Even though there is evidence to show that Tua did not intend the assault on Bermas to be as severe as it was, this does not absolve him from liability for using the assault for the purpose of witness intimidation.  Tua knew that Seau recently used a knife to commit a brutal attack. In view of all the circumstances, a reasonable person in Tua's position would know or should have known that the nontarget offense—murder—was a reasonably foreseeable consequence of the act he aided and abetted—witness intimidation by means of a brutal physical attack on another witness.  Thus, here, unlike the circumstances in *Leon*, there is the requisite "close connection" between "the target crime a defendant aids and abets and the offense actually committed."  (*Hoang*, *supra,* 145 Cal.App.4th at p. 269.)  We conclude there is substantial evidence to support Tua's conviction for murder in the second degree.

## IV. *Vouching for Witness Credibility*

### A. *The Parties' Arguments*

Defendants argue the trial court abused its discretion in denying their motions for a mistrial after law enforcement witnesses repeatedly vouched for Rivera's credibility. They contend Rivera's testimony was central to the prosecution's case; therefore, law enforcement's "stamp of credibility" distorted the legal significance of Rivera's testimony and denied them due process.

The People contend the trial court appropriately sustained Seau's objections to the testimony concerning Rivera's credibility, struck the testimony, and admonished the jury. The jury is presumed to have followed the court's admonitions, and Seau does not show prejudice. Therefore, the court did not abuse its discretion in denying the motions for mistrial. The People alternatively argue that the error, if any, was harmless.

### B. *Additional Facts*

Detective Johnson testified that by the end of the investigation, it appeared that Rivera was telling the truth in police interviews. Johnson intentionally showed Rivera a photograph of Bermas lying dead in the street. Johnson knew that Rivera was upset about what had happened to Bermas, and she wanted to play on Rivera's conscience. Rivera could have refused to talk to police at any time but she kept talking because she felt badly about Bermas. Johnson said, "Up through her testimony here, I believe that she did that because she felt badly about [Bermas]."

Defendants objected. Tua said it was unconstitutional for the witness to vouch for the veracity of any other witness. He asked the court to strike all of Johnson's testimony

46

and made a motion for a mistrial. The court denied the motion for mistrial, sustained the objection, and struck Johnson's response.

Seau asked the court to admonish the jury. Tua did not join in the request, and the court declined to make an admonition. The court said defense counsel were taking opposing positions. It noted that it would allow questions about the investigation because Seau opened the door with the theory that his identification as the direct perpetrator was contrived by law enforcement officers.

Later, Detective Campagna testified he believed at first Rivera was withholding information about the identity of the person who assaulted Lozano. He said he pressed her to reveal the assailant's identity. Campagna explained, "I asked initially, like, *Come on. You know, Vanessa. You are standing right there. You don't know*? And, you know, thinking that she is holding back information. And then finally I realized, *No, I mean, maybe she didn't see it*."

Tua made a motion for a mistrial, saying this was the second time during the trial a law enforcement officer had vouched for the credibility of the witness. Tua characterized Campagna's testimony as "*Yes, I believe she is now being truthful*." Alternatively, Tua asked the court to strike that portion of Campagna's testimony. Seau joined in the motion for mistrial, asserting prosecutorial error. The court denied the motion for mistrial and said there was no evidence of prosecutorial error. The court admonished the jury to disregard the officer's opinion about the truth or nontruth of Rivera's statements, and told the jury it was the ultimate fact finder.

C. *Legal Principles and Standard of Review*

It is improper for a law enforcement officer to testify at trial about a lay opinion she may have concerning the veracity, or lack of veracity, of information provided by a witness or defendant. (*People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*).) For example, an officer cannot opine whether a witness was telling the truth. (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39-41.) The finder of fact, not the witness, draws the ultimate inference from the evidence. (*Melton*, at p. 744.)

A motion for a mistrial should be granted when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Welch* (1999) 20 Cal.4th 701, 749.) A mistrial should be granted if the court is advised of prejudice that cannot be cured by admonition or instruction. (*People v. Haskett* (1982) 30 Cal.3d 841, 854 (*Haskett*).) Where an objection has been sustained, the reviewing court presumes any prejudice arising from the question is abated. (*People v. Dykes* (2009) 46 Cal.4th 731, 764.) We review a denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Williams* (1997) 16 Cal.4th 153, 210.)

D. *Analysis*

The trial court did not abuse its discretion in denying the motions for mistrial. Defendants do not show the existence of prejudice that could not be cured by admonition or instruction. (*Haskett*, *supra*, 30 Cal.3d at p. 854.) The trial court struck Johnson's remarks and admonished the jury to disregard Campagna's opinion about the truth or nontruth of Rivera's statements. The jury had a full opportunity to listen to Rivera's testimony and assess her credibility. The court told the jury it was the ultimate fact

48

finder.  We presume the jury heeded the admonitions and any error was cured.  (*Wash*, *supra*, 6 Cal.4th at p. 263.)

Further, defendants cannot show that any error, if it occurred, was prejudicial. Tua does not assert he was prejudiced by Campagna's opinion that Rivera was telling the truth when she recanted her statement that Tua assaulted Lozano and instead identified Seau as the assailant.  Rather, he focuses his argument on the sufficiency of the evidence to support his convictions as an aider and abettor.  As we have discussed (*ante*, pt. III.C.), there is ample, corroborated evidence from which the trier of fact could conclude that Tua aided and abetted Seau by helping to distract Lozano immediately prior to Seau's attack on him and in intimidating Rivera by forcing her to watch Seau's attack on Bermas.

Seau argues the evidentiary weaknesses in the case against him made it imperative the jury believe Rivera's testimony.  He asserts Rivera was the only witness to corroborate Lozano's testimony and to describe the attack on Bermas.  But as we have already noted (*ante*, pt. II.D.2), Rivera's testimony is corroborated by physical evidence and by other witnesses, including Lozano and Jason Cruz.  We conclude it is not reasonably probable defendants would have received a more favorable result without the challenged statements by Johnson and Campagna.  (*Melton*, *supra*, 44 Cal.3d at p. 744; *Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

49

V.  *Pinpoint Instructional References to Seau's Name*

A.  *The Parties' Arguments*

Seau contends the trial court violated his rights under state law and his rights under the Sixth and Fourteenth Amendments by including his name in several of the jury instructions.  He argues the modified instructions highlighted his role as the perpetrator of the attempted murder and in view of the weaknesses in the prosecution's case, the error was prejudicial.

The People assert the modification of the jury instructions was needed to distinguish the different theories of liability on which Seau and Tua were tried.  They contend the instructions were not argumentative and any error was harmless under *Watson*, *supra*, 46 Cal.2d at page 836.  Our review is de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218 (*Posey*).)

B.  *Additional Facts*

Seau objected to the inclusion of his name in jury instruction No. 402 (CALCRIM No. 402).  This instruction states, in pertinent part:  "To prove that David Tua is guilty of Murder, the People must prove beyond a reasonable doubt that:  [¶]  2.  During the commission of an assault with a deadly weapon upon Louiegie Bermas or attempting to dissuade a witness from reporting a crime a co-participant in those crimes, Roland Seau, committed the crime of Murder."

Without objection,[12] the court modified jury instruction No. 601 (CALCRIM No. 601): "Roland Seau acted *willfully* if he intended to kill Randy Lozano when he acted. Roland Seau *deliberated* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. Roland Seau acted with premeditation if he decided to kill before completing the acts of attempted murder. [¶] An aider and abettor need not act with deliberation and premeditation. It is sufficient if the perpetrator acts with deliberation and premeditation."

C. *Analysis*

An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law and invites the jury to draw inferences favorable to one of the parties from the specified evidence. (*People v. Lewis* (2001) 26 Cal.4th 334, 380; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1244.) Read in the context of all instructions that were given to the jury, including instructions for first or second degree murder with malice aforethought, first degree murder, attempted murder, and assault with a deadly weapon, none of which mention either defendant by name, the modified instructions clarified the different theories of liability for each defendant and did not invite the jury to draw prejudicial inferences from the evidence. The record shows that the "trial court 'fully and fairly instructed [the jury] on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th

_____

12    The People argue Seau has forfeited this argument on appeal by failing to object at trial. In asserting forfeiture, the People ignore the principle that a defendant may assert for the first time on appeal an instructional error affecting his substantial rights. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34.)

1082, 1088 [we consider the jury instructions in their entirety and assume jurors are capable of understanding and incorporating all instructions that were given].)

Further, even if there was error, it was not prejudicial. As we have discussed (*ante*, pt. II.D.2), the evidence identifying Seau as Lozano's and Bermas's assailant was not weak. There was no evidence to show that Tua was the person who physically assaulted Bermas. The evidence supporting the theory that Tua assaulted Lozano is extremely weak. Therefore, any error in the jury instructions in identifying Seau as the principal actor, and Tua as his aider and abettor, is harmless.

## VI. *Sentencing Error*

### A. *The Parties' Arguments and Standard of Review*

The court sentenced the defendants to consecutive, indeterminate terms for attempted murder and murder, and imposed two consecutive five-year sentences on each count, as required by section 667, subdivision (a) (prior serious felony enhancement). Under the determinate sentencing law (§ 1170 et seq.), the court sentenced the defendants on the count of assault with a deadly weapon but stayed the sentence on that count pursuant to section 654, and imposed a five-year prior serious felony enhancement, to run consecutively to the indeterminate term. (§ 667, subd. (a).) On the count of witness intimidation, the court ordered the sentence to run concurrently with the indeterminate term.

Defendants argue that a prior serious felony enhancement cannot be imposed and executed on sentences that have been stayed or that run concurrently with the indeterminate counts. The People assert that a prior serious felony enhancement does not

52

attach to any particular determinate count but is added once in computing the aggregate determinate term. Thus, they suggest that this type of enhancement—based on defendants' status rather than on an act or omission committed during an underlying felony—should be viewed as "not attached" to the determinate counts such that the trial court can elect to impose it consecutive to the indeterminate counts even if the determinate counts themselves are run concurrently or stayed pursuant to section 654.

An unauthorized sentence is subject to correction when it comes to the attention of the reviewing court. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1044-1045.) The issue raised presents a pure question of law, which we review de novo. (*People v. Camp* (2015) 233 Cal.App.4th 461, 467.)

B. *Analysis*

The question presented here appears to be one of first impression. Where a court sentences a defendant to a combination of indeterminate and determinate terms, and all portions of determinate sentence are either concurrent to the indeterminate terms or stayed pursuant to section 654, can the court nonetheless elect to run the determinate prior serious felony enhancement *consecutive to* the indeterminate terms?

Section 667, subdivision (a) mandates that "[a]ny person convicted of a serious felony . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction . . . ." As relevant here, "serious felony" includes murder; any felony in which the defendant personally inflicts great bodily injury on any person other than an accomplice; attempted murder; and intimidation of victims or witnesses in violation of section 136.1. (§ 1192.7, subd. (c).)

An enhancement is "an additional term of imprisonment added to the base term."  (Cal. Rules of Court, rule 4.405(3).  The "base term" is "the determinate prison term selected from among the three possible terms prescribed by statute or the determinate prison term prescribed by law if a range of three possible terms is not prescribed."  (*Id.*, subd. (2).)

Prior serious felony enhancements are added once to each count on which an indeterminate sentence is imposed and once for the combined counts on which an aggregate determinate term has been imposed.  (*People v. Tassell* (1984) 36 Cal.3d 77, 90 (*Tassell*), overruled on other grounds by *People v. Ewoldt* (1994) 7 Cal.4th 380, 401; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1163-1164 (*Gutierrez*); *People v. Sasser* (2015) 61 Cal.4th 1, 12 (*Sasser*).)  In *Sasser*, the Supreme Court explained that in the determinate sentencing scheme, "enhancements for prior convictions go to the nature of the offender, not the offense, and thus 'have nothing to do with particular counts.' "[13] (*Sasser*, at p. 10, quoting *Tassell,* at p. 90.)  Here, the court explicitly linked the prior serious felony enhancement to the count of assault with a deadly weapon, stayed the sentence for assault, and ordered that the five-year term for the prior serious felony enhancement run consecutive to the indeterminate terms.  (§ 667, subd. (a)(1).)

_____

[13]    In *People v. Williams* (2004) 34 Cal.4th 397, 404-405, the California Supreme Court stated that "[t]he Three Strikes law, unlike section 1170.1, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses, and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense.  Accordingly, we conclude that, under the Three Strikes law, section 667(a) enhancements are to be applied individually to each count of a third strike sentence."

We begin by addressing a minor sentencing error made by the trial court. It has no actual effect on the amount of prison time defendants will serve, but it is significant in setting the stage for defendants' substantive sentencing arguments. As noted, the court expressly linked the determinate prior felony enhancement to the assault-with-a-deadly-weapon count. This was a mistake. If it was proper at all, the prior serious felony enhancement should have been imposed on the aggregate determinate sentence. (*Tassell*, *supra*, 36 Cal.3d at p. 90; *Gutierrez*, *supra*, 28 Cal.4th at pp. 1163-1164; *Sasser*, *supra*, 61 Cal.4th at p. 12.) The aggregate determinate sentence includes the punishment attributable to each defendant's convictions for both assault with a deadly weapon (which the court stayed) and witness intimidation (which the court ordered to run concurrently with the indeterminate sentences).

But to say that the prior serious felony enhancement "ha[s] nothing to do with particular counts" (*Tassell, supra,* 36 Cal.3d at p. 90) does not mean that the determinate counts are completely irrelevant in deciding how the enhancement will be imposed. It is critical to appreciate that the comment in *Tassell* was made in the context of limiting the *number* of enhancements that could be imposed, and not in an effort to suggest that the enhancement is somehow free-floating and totally independent of the predicate offense(s). It is, after all, an enhancement that attaches to one or more substantive offenses. Indeed, it is quite clear from the statutory language that the enhancement is not completely independent of the predicate offenses because only certain crimes—i.e., serious felonies as defined in section 1192.7—will support a section 667, subdivision (a) enhancement.

To simplify matters, we will assume a defendant is convicted on two counts, one of which (Count 1) carries an indeterminate term and one of which (Count 2) carries a determinate sentence. On Count 1, the court imposes the indeterminate term plus the five-year prior serious felony enhancement. As to Count 2, the court now has a choice. It could run the determinate term (the base term *plus* the serious felony enhancement) consecutively or concurrently to the sentence on Count 1. But what would the justification be for imposing a concurrent base term but electing to run the enhancement consecutively? Alternatively, consider a similar situation but assume the sentence on Count 2 must be stayed pursuant to section 654. Again, what would the justification be for staying the base term but imposing a consecutive term for an enhancement that would not exist but for the offense on which the sentence was stayed?

Section 667, subdivision (a) is silent as to whether a prior serious felony enhancement can run consecutively to the indeterminate sentence where all of the defendant's determinate offenses either have been stayed or run concurrently with the indeterminate sentence. Here, we have both a concurrent determinate term and a stayed determinate term, so there would seem no impediment to either imposing the enhancement concurrently or staying it. But in the absence of authority that would allow the enhancement to be imposed independent of *any* determinate term, and mindful of the rule that a "defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of a statute" (*People v. Overstreet* (1986) 42 Cal.3d 891, 896), we hold that where the trial court is required to stay a determinate sentence under section 654 or exercises its discretion to run the determinate sentence

56

concurrently with the indeterminate sentence, the prior serious felony enhancement that attaches to those determinate counts must also be stayed or ordered to run concurrently. (Cf., *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1310 [under the sentencing scheme an enhancement may not be imposed as a subordinate term on its own]; *People v. Guilford* (1984) 151 Cal.App.3d 406, 411 [an enhancement must necessarily be stayed where the sentence on the court to which it is added is required to be stayed].)

## DISPOSITION

The judgments sentencing each defendant to a five-year consecutive term on his determinate sentence for a prior serious felony enhancement are reversed. The matter is remanded for resentencing in accordance with this opinion. In all other respects, the judgments are affirmed.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.

57